399 So.2d 1362 (1981)
Earl ENMUND, Appellant,
v.
STATE of Florida, Appellee.
No. 48525.
Supreme Court of Florida.
April 16, 1981.
Rehearing Denied July 20, 1981.
*1363 Jack O. Johnson, Public Defender; Steven H. Denman, W.C. McLain, and David A. Davis, Asst. Public Defenders, Bartow, for appellant.
Jim Smith, Atty. Gen., Donald K. Rudser and Charles A. Stampelos, Asst. Attys. Gen., Tallahassee, for appellee.
PER CURIAM.
This cause is before the Court on appeal from a judgment of conviction on two counts of murder in the first degree and one count of robbery. The Circuit Court of the Tenth Judicial Circuit, in and for Hardee County, sentenced appellant Earl Enmund to death, thus vesting in this Court jurisdiction of his appeal. Art. V, § 3(b)(1), Fla. Const.
The appellant and co-defendant Sampson Armstrong were tried together and convicted of the first-degree murders and robbery of Thomas and Eunice Kersey. After returning verdicts of guilt the trial jury heard evidence on the issue of sentence pursuant to section 921.141, Florida Statutes (1975), and recommended the death penalty for both defendants. The trial court imposed sentences of death on the appellant for the two counts of first-degree murder and a sentence of life imprisonment for the crime of robbery. We affirm the judgments of guilt of murder and robbery and the sentences of death.

I. Facts
On April 1, 1975, at about eight o'clock, a.m., the bodies of Thomas and Eunice Kersey were discovered by their daughter in their rural Hardee County home, located on state highway 62 between Fort Green to the west and Wauchula to the east. Mr. and Mrs. Kersey, aged eighty-six and seventy-four respectively, had been shot to death.
Some of the evidence constituting the state's case in the trial court consisted of physical items recovered at the scene and examined in the course of investigation. The bodies were found on the kitchen floor, near the back door of the home. There was a quantity of blood on the floor, some five feet away from where the bodies were lying, that prompted the authorities to investigate the possibility that one of the perpetrators was wounded during the attack. Later that morning, police found Jeanette Armstrong, the wife of co-defendant Sampson Armstrong, being treated for a gunshot wound in a hospital in nearby Avon Park, in Highlands County. The blood recovered at the scene proved to be of a different type from either of the Kerseys' blood, and to match the blood type of Jeanette Armstrong.
On the ground outside the house, investigators found a plastic jug filled with water.
*1364 There were four firearm projectiles found at the scene. One was on the ground outside the house, one in the door jamb of the back door, one in the water heater in the kitchen of the house, and one on the floor, under the body of Mrs. Kersey. Mrs. Kersey was shot six times in all, with three of the wounds being superficial so that three of the bullets exited the body. Three bullets remained in her body and were recovered. The three bullets found in the body all entered the body in the right side and passed downward.
Mr. Kersey was shot twice. One bullet entered his right arm and passed on through his heart to the left side of his body. The other entered his chest from directly in front. Both bullets were recovered. The bullet that entered from the right side had a slight downward angle. The one that entered the front of the chest was almost straight in its path from front to back. According to expert firearms identification testimony, one of the bullets recovered was a .38 caliber and the other was a .22 caliber. The .38 caliber bullet from the body of Mr. Kersey, a.38 caliber bullet from the body of Mrs. Kersey, and the .38 caliber bullet found in the kitchen door jamb, where all fired from the same weapon. The .22 caliber bullet found in the body of Mr. Kersey and a .22 caliber bullet from Mrs. Kersey were both fired from the same gun.
The pathologist who testified at trial told the court and the jury that when a bullet enters the body, it can be deflected in numerous ways, so that it is difficult to discern the angle of fire from the path of the bullet. With regard to the specific question of reconstructing the position of Mrs. Kersey when she was shot, based on the paths of the bullets, the pathologist testified, "Well, there are all sorts of possibilities... . There is really no way that I could determine what position her body was in when she was shot... . [S]he was shot from below, above, and behind." None of the entrance wounds on either of the bodies were inflicted from a range of closer than several feet away.
The state presented the testimony of a witness who drove by the Kersey home between 7:30 and 7:40 a.m. on the day the bodies were found. When she passed the Kersey home, she saw on the side of the road a large, cream-colored car with a license tag bearing the prefix number 18. There was a black man in the car. Another witness for the state drove by the house at 7:35 that morning and saw a car parked beside the road about two hundred yards west of the house. It was a large, yellow car with a dark colored top. There was one person in the car.
The state's evidence also included the testimony of two of the Kerseys' neighbors. One testified that on April 1st he was at work on his own land only two or three hundred yards from the Kerseys' house when, at about 7:45 a.m., he heard from six to fifteen shots of gun fire and some high-pitched screaming. The other neighbor said that he lived only two hundred yards west of the Kerseys, and that between 7:30 and 8:00 o'clock that morning he heard about seven loud sounds. He would have thought that they were caused by Mr. Kersey hammering to separate some scrap metal, except for their irregular sequence. From the sounds he remembered, he concluded that they also could have been gunfire.
A neighbor of the appellant also testified for the state. He said he lived about three-fourths of a mile from Enmund's home, and that they both lived on a road that runs off of New York Avenue south of the town of Wauchula. This witness testified that on the morning of April 1st, at about 6:30 he was standing out beside the road, New York Avenue, that goes into Wauchula to the north. He was waiting for a ride that was to take him to another town on personal business. The person who was to meet him there did not come that morning, but he was still standing there waiting for him after 8:00 o'clock. The witness said that at approximately 6:30 or 6:45, he saw Earl Enmund and his former common-law wife Ida Jean Shaw in their yellow Buick with a vinyl top. Ida Jean Shaw was driving. There were two others in the back seat, one *1365 male and one female. The car traveled north toward town (the town of Wauchula). At about 8:00 o'clock, the car came back, travelling "pretty fast" in a southerly direction on New York Avenue, with the appellant driving, Ida Jean Shaw in the front seat, and one of the other two people in the car lying down across the back seat.
The husband of the Kerseys' granddaughter testified that Mr. Kersey usually kept large amounts of cash on his person. He generally kept the cash in the form of one-hundred-dollar bills. It was not unusual for him to have from ten to twenty of these on his person at any given time. He kept the money in his wallet, and the wallet was in his hip pocket at all times. He normally slept in his regular work clothing and kept the wallet in his pocket even as he slept.
Mr. Kersey, the witness testified, liked to show his cash to people he dealt with, and he did so frequently and indiscriminately. He tended to save his money rather than to spend it, and he was proudly vocal about having it. He was a large, strong man who felt that he could protect his wallet.
Another witness testified that two weeks prior to the murders, he saw that Mr. Kersey had from twelve to fifteen hundred dollars on his person.
A few weeks prior to the murders, the appellant and a friend jointly purchased a calf from Mr. Kersey. They paid him in cash and when Mr. Kersey took out his wallet to put away the money he showed them its contents. Appellant Enmund said, "Look at the money this man's got." Mr. Kersey responded, "That ain't no money. I can dig up $15,000, $16,000 any time I want to." Appellant's friend told Mr. Kersey that he shouldn't be showing his money around like that. Mr. Kersey said, "I know you, Jim." The other man responded, "Yeah, you know me but you don't know the rest of them." After the killings, Mr. Kersey's wallet was not found on his person or anywhere in the house.
J.B. Neal testified that at about noon on April 1, 1975, he saw co-defendant Sampson Armstrong in Lake Placid, in Highlands County. Armstrong told Neal that he and his wife Jeanette had done a robbery that morning at a ranch house outside of Wauchula and that Jeanette had been shot. Armstrong told the witness that they had gone to the back door of the house of an elderly man and woman, saying that they needed water for an overheated car. When Mr. Kersey came out of the house, Armstrong grabbed him, held his gun on him, and told Jeanette to get the money out of his pocket. Then, the old man cried out to his wife, and through a window Armstrong saw Mrs. Kersey coming out the front door and around the house with a gun. Mrs. Kersey shot Jeanette Armstrong. Then Armstrong knocked the old man down and shot Mrs. Kersey. Mr. Kersey got back up and Armstrong shot him in the chest. After the shooting, they put the old people in the house, took the money and left.
Jeanette Armstrong is the daughter of Ida Jean Shaw. In April of 1975, Ida Jean Shaw and Earl Enmund were living together as husband and wife, and had been doing so for about twelve years.
There was testimony that the investigating authorities, based on witnesses' descriptions of the car seen near the Kersey home the morning of the murders, began to search for a large, yellow or cream-colored car with a dark top and having an "18" license tag prefix. They found a car meeting this general description in the possession of Ida Jean Shaw.
At Walker Memorial Hospital in Avon Park on the morning of the murders, police questioned Ida Jean Shaw concerning Jeanette Armstrong's gunshot wound. She told them that she and Jeanette had been travelling that morning from Wauchula to Avon Park when Jeanette entered an orange grove to urinate and was shot. In the subsequent course of the investigation of the Kersey murders, Ida Jean Shaw gave a statement to the state attorney implicating the appellant and Sampson Armstrong in the crimes. Subsequent to that initial statement, she gave two statements, one of them a formal deposition, in which she repudiated the original statement. In these statements she said that Jeanette Armstrong *1366 left her house on March 31, 1975 with two men referred to as Luke and Willie. According to this story, Jeanette said that they were going to Fort Myers to a nightclub. On the following morning, Luke and Willie brought Jeanette home wounded. Jeanette, Luke and Willie then told Ms. Shaw to tell anyone who asked that Jeanette had been shot while trespassing in a citrus grove. The import of the story told in the depositions was to implicate "Luke and Willie" in the Kersey murders and to exculpate the defendants. In one of her depositions, Ida Jean Shaw stated that her earlier statement implicating the defendants in the crimes was false and was fabricated by agreement with Jeanette Armstrong and calculated to put Earl and Sampson in jail and thus be free of the strictures of married life.
Ida Jean Shaw, over the objections of the defendants, was called to testify at trial as a court's witness. The court examined her and then the state and counsel for each of the defendants cross-examined her.
Ms. Shaw testified at trial as follows. At and around the time of the crimes, she and the appellant lived together in a house on Revell Road in Wauchula, and that they had held themselves out to friends and neighbors and in business transactions as husband and wife for twelve years. Her daughter Jeanette was married to Sampson Armstrong and lived in Lake Placid. On the weekend preceding Tuesday, April 1st, Ms. Shaw celebrated a birthday. On Friday night, Jeanette came to her home. On Sunday, she and Jeanette went to Lake Placid and brought Sampson back. On Monday night, March 31, Jeanette, Sampson, and the appellant Enmund were all there at the house in Wauchula. On Tuesday, April 1st, when she awoke at about 7:45 a.m., none of the three was there. Neither was her brown and yellow 1969 Buick.
Ms. Shaw got up and went to the neighborhood wash house. About ten minutes later, either Enmund or Sampson Armstrong came into the wash house and told her that Jeanette had been shot. Ida Jean Shaw went back to the house. Jeanette was in the appellant's red Plymouth automobile. Sampson was with her and the appellant was in the house. Ms. Shaw then took Jeanette up to the local store corner and called an ambulance. Then appellant Enmund came to the corner where they were awaiting the ambulance and asked her what had happened to Jeanette. Ida Jean Shaw told Enmund that Jeanette had been shot in an orange grove. Then the ambulance came and Ida Jean accompanied Jeanette on the ride to the hospital. Ida Jean learned from Jeanette how she was shot. Earl followed in a separate car. Sampson Armstrong also went to the hospital that day.
After spending Tuesday morning at the hospital, Ms. Shaw left there with Earl and Sampson. They went to Wauchula to get the children and then went on to Lake Placid. On the way to Wauchula, Ida Jean Shaw asked the appellant "why he did it." He replied that he had seen Mr. Kersey's money and therefore decided to rob him. Sampson Armstrong said that he made sure the people were dead.
Ida Jean Shaw testified further that on Wednesday, April 2, 1975, she, Earl, Sampson, and some of her children were in a car on their way home from the hospital when Sampson gave her $200. By passing written notes in the car, she asked him how much money he got out of the robbery and he responded that he had $600 left. She took the $200 and made a loan payment on an account of Earl Enmund's that was in arrears. There was corroborating testimony of this, and that the bill was paid with two one-hundred-dollar bills.
Ms. Shaw testified that prior to the events of April 1st, she kept a .22 caliber pistol in the glove compartment of her car. On April 2, she removed the gun from the loft at her house on Earl Enmund's directions. He and Sampson told her to get rid of the gun and also a .38 caliber pistol that was at the house, because, Sampson said, they had been used to kill some people. She put the guns in the bottom of a bucket of greens and gave the bucket to a friend, Jeanette's paternal uncle. This person testified *1367 that the bucket was a large and heavy metal one and that the greens spoiled in the trunk of his car. He said he threw them away, bucket and all, and didn't know about the guns. The murder weapons were never recovered.
At trial Ms. Shaw testified that the story about Luke and Willie was a complete fabrication, and that she made up the story and related it at the request of the defendants. Earl Enmund, she said, instructed her on this matter in letters smuggled out of the jail.
The state's counsel moved that Ida Jean Shaw be called as a court's witness on the ground that due to the inconsistencies in her pretrial statements, the state was not certain how she would testify and would not vouch for her credibility. Through her examination by the court, cross-examination by the state, and cross-examination by counsel for each of the defendants, the following matters pertaining to her credibility were brought out for consideration by the jury. Ms. Shaw was granted immunity from prosecution for any role she might have played in the murders and robbery. As related above, she gave several inconsistent statements during the investigation and prosecution of the crimes. One of her statements was in a deposition under oath, and at trial she conceded that she had lied in that statement. Prior to the trial, she was charged with perjury. She was arrested and held in jail for thirteen days. The prosecutors advised her of the maximum penalty for the crime of which she stood accused. Then they promised her that she would not be prosecuted for perjury if she would testify at the murder and robbery trial and tell the truth.

II. Issues on Appeal of the Judgment of Conviction
The appellant raises several points which he contends require the reversal of his convictions.
The appellant contends that the trial court erred in refusing to grant judgment of acquittal of the charge of robbery on the ground that there was insufficient evidence to support the verdict of guilt of that crime. We have carefully reviewed the record of the proceedings below and conclude that the judgment of conviction of the crime of robbery rests upon legally sufficient evidence.
The appellant argues that the trial court erred in denying his motion to exclude the testimony of Ida Jean Shaw. He asserts that her inconsistent pretrial statements, which resulted in a charge of perjury, rendered her so unreliable as to be an incompetent witness. He also contends that the pendency of her perjury prosecution, which she was promised would be discontinued if she would testify truthfully, created an unacceptably high risk that her testimony would be the product of coercion.
With regard to the unreliability argument, the trial court informed the jury that Ms. Shaw was being called as a court's witness because the state could not vouch for her credibility. The jury was instructed to consider her testimony and to accord it whatever credibility they thought it deserved. It is within the discretion of the trial judge to call an uncooperative witness as a court's witness to allow the state to ask leading questions. McCloud v. State, 335 So.2d 257 (Fla. 1976).
With regard to the issue of coercion, the appellant cites Davis v. State, 334 So.2d 823 (Fla. 1st DCA 1976), cert. denied, 345 So.2d 427 (Fla. 1977), and Lee v. State, 324 So.2d 694 (Fla. 1st DCA 1976). The Lee case quoted this Court's statement in Mathews v. State, 44 So.2d 664 (Fla. 1950), that
in interviews with witnesses before trial, the examiner "must exercise the utmost care and caution to extract and not to inject information, and by all means to resist the temptation to influence or bias the testimony of the witnesses."
Lee v. State, 324 So.2d at 698.
In Davis, the prosecuting attorney asked the trial court to delay the swearing of the jury because one of the witnesses he intended to call had become uncooperative. The witness, a close friend of the defendant, had made a statement in a deposition which linked the defendant to the crime but immediately *1368 before trial gave a different account of what she knew. The prosecutor conferred with her and told her that she had three choices: refuse to testify and be held in contempt of court and jailed; give an account that differed from her deposition statement and be charged with perjury and possibly imprisoned for fifteen years; or testify to "the truth" in which event nothing would happen to her. The circumstances of the prosecutor's conference with the witness were revealed to the jury. On appeal, the district court reversed and remanded for a new trial, citing as authority Lee v. State. Applying the Lee principle to the facts before it, the court in Davis concluded:
While it is true that the assistant state attorneys admonished the witness to tell the truth, it must have been obvious to the witness that the "truth" was that which she had testified to at an earlier deposition. Rules of evidence and procedure exist which are designed to assist prosecution and defense alike in eliciting the truth from balky witnesses. Coercion and threats are not among these rules.
Davis v. State, 334 So.2d at 826.
The appellant contends that when the prosecution told Ida Jean Shaw that she could be released from jail and have the perjury charges dropped if she would tell "the truth," there is an unacceptably high probability that she understood that the "truth" the prosecution wanted was testimony linking the appellant to the crimes. We disagree. In Lee v. State, the error was not in allowing the witness to testify but in keeping from the jury information regarding the arrangement by which the state gained the cooperation of the witness. In Davis, the prosecutor indicated to the witness that she should testify consistently with what she said before. Thus he "injected" information. In the case sub judice, the prosecution did not suggest to Ms. Shaw what they wanted her to say, but simply advised her to tell the truth. We hold that the court did not abuse its discretion in allowing into evidence the testimony of Ida Jean Shaw.
The appellant contends that a new trial is required because the jury was not fully informed of the understanding between the state and Ida Jean Shaw. It is true, as appellant points out, that it is a denial of due process if the jury is misled as to facts bearing on the credibility of a witness. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). If a failure to fully inform the jury of the interest of a witness could in any reasonable likelihood have affected the decision of the jury, a new trial is required. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Wolfe v. State, 190 So.2d 394 (Fla. 1st DCA 1966). Our review of the record reveals that the jury in the present case was fully informed of Ms. Shaw's immunity transaction and her pending perjury prosecution.
The appellant contends that there is no evidence that he committed premeditated murder on either of the victims, or that he was present aiding and abetting the robbery when they were shot. He argues that the very most the jury could have concluded from the evidence is that he was in the car seen out by the highway when the robbery and murders were committed. Therefore, he contends, the most serious crime of which he could be convicted with regard to each of the homicides is murder in the second degree, based on the felony murder rule.
In support of this contention appellant cites the distinction drawn by this Court in State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), between first-degree felony murder and second-degree felony murder. At the time of the crimes, the degrees of homicide were defined by section 782.04, Florida Statutes (1973). The definitions of murder given in that statute had been revised by chapter 72-724, Laws of Florida, and those revisions were construed in Dixon. The Court said that the new statute established "two separate and easily distinguishable degrees of crime, depending upon the presence of the defendant as a principal in the first or second degree." *1369 State v. Dixon, 283 So.2d at 11. Section 782.04 as amended by chapter 72-724 evinced a legislative intent "to resurrect the distinction between principals in the first or second degree on the one hand and accessories before the fact on the other, in determining whether a party to a violent felony resulting in murder is chargeable with murder in the first degree or murder in the second degree." Id. at 11. The distinction had previously been laid to rest for all purposes by chapter 57-310, Laws of Florida. See § 776.011, Fla. Stat. (1973).
In a later case, the Court explained that the Dixon construction had provided a limited scope to the second-degree felony murder provision, and held that under the murder statute as amended by chapter 72-724,
an individual who personally kills another during the perpetration or attempt to perpetrate one of the enumerated felonies is guilty of first degree murder. In such circumstances, the statutory scheme does not allow for a conviction of second degree murder. Moreover, the felon's liability for first degree murder extends to all of his co-felons who are personally present. As perpetrators of the underlying felony, they are principals in the homicide. In Florida, as in the majority of jurisdictions, the felony murder rule and the law of principals combine to make a felon generally responsible for the lethal acts of his co-felon. Only if the felon is an accessory before the fact and not personally present does liability attach under the second degree murder provision of the applicable statute in the instant case.
Adams v. State, 341 So.2d 765, 768-69 (Fla. 1976), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 158 (1977) (footnote omitted). We conclude, therefore, that if the appellant's conduct that the jury could have found from the evidence made him an accessory before the fact to the underlying felony of robbery, then his contention that the highest offense for which he may be convicted is second-degree murder must be accepted. If, on the other hand, the jury could have concluded from the evidence that the appellant was a principal of the first or second degree in the crime of robbery, then his contention is without merit and we must hold that the evidence was sufficient for a verdict of guilty of murder in the first degree. To determine the issue as thus framed, it is necessary, as Dixon suggested, to "refer to the rich heritage of case law on the distinctions between principals in the first or second degree and accessories before the fact." State v. Dixon, 283 So.2d at 11.
All persons participating in a crime are principals of the first or second degree. The actual perpetrator is a principal of the first degree. A person who does not commit the crime with his own hands but is present, aiding and abetting the actual perpetrator, is a principal of the second degree. They are both equally guilty of the crime being committed. Lake v. State, 100 Fla. 373, 129 So. 827 (1930). "An accessory before the fact is one who, though absent at the time of the commission of an offense, does nevertheless procure, counsel, command, or abet another to commit such offense." Kauz v. State, 98 Fla. 687, 124 So. 177, 178 (1929). See generally Henderson v. State, 70 So.2d 358 (Fla. 1954); Albritton v. State, 32 Fla. 358, 13 So. 955 (1893).
The legislature did away with these distinctions when it enacted section 776.011, Florida Statutes (1973). Ch. 57-310, § 1, Laws of Fla. Section 776.011 provided:
776.011 Principal in first degree.  Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, is a principal in the first degree and may be charged, convicted and punished as such, whether he is or is not actually or constructively present at the commission of such offense.
However, when the legislature amended the law of murder in 1972, ch. 72-724, Laws of Fla., it revived a distinction, according to this Court's construction in Dixon and Adams, between principals of the first and second degree on the one hand and accessories before the fact on the other, for purposes *1370 of distinguishing first and second degree felony murder. This is why the preexisting case law on that distinction is still relevant. The law of murder as amended by chapter 72-724 was in force at the time of the crimes at issue herein. It provided:
782.04 Murder. 
(1)(a) The unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any arson, rape, robbery, burglary, kidnapping, aircraft piracy, or the unlawful throwing, placing, or discharging of a destructive device or bomb, or which resulted from the unlawful distribution of heroin by a person over the age of seventeen years when such drug is proven to be the proximate cause of the death of the user, shall be murder in the first degree and shall constitute a capital felony, punishable as provided in § 775.082.
(b) In all cases under this section, the procedure set forth in § 921.141 shall be followed in order to determine sentence of death or life imprisonment.
(2) When perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, or when committed in the perpetration of, or in the attempt to perpetrate, any arson, rape, robbery, burglary, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, except as provided in subsection (1), it shall be murder in the second degree and shall constitute a felony of the first degree, punishable by imprisonment in the state prison for life or for such term of years as may be determined by the court.
(3) When perpetrated without any design to effect death, by a person engaged in the perpetration of, or in the attempt to perpetrate, any felony other than arson, rape, robbery, burglary, kidnapping, aircraft piracy, or the unlawful throwing, placing, or discharging of a destructive device or bomb, it shall be murder in the third degree and shall constitute a felony of the second degree, punishable as provided in § 775.082, § 775.083, or § 775.084.
§ 782.04, Fla. Stat. (1973).
In a prosecution for murder in the first degree, if the accused was present aiding and abetting the commission or attempt of one of the violent felonies listed in the first-degree murder statute, he is equally guilty, with the actual perpetrator of the underlying felony, of first-degree murder. E.g. Pope v. State, 84 Fla. 428, 94 So. 865 (1922). Furthermore,
the presence of the aider and abetter need not have been actual, but it is sufficient if he was constructively present, provided the aider, pursuant to a previous understanding, is sufficiently near and so situated as to abet or encourage, or to render assistance to, the actual perpetrator in committing the felonious act or in escaping after its commission.
Id. 84 Fla. at 446, 94 So. at 871.
There was no direct evidence at trial that Earl Enmund was present at the back door of the Kersey home when the plan to rob the elderly couple led to their being murdered. J.B. Neal's account of what Sampson Armstrong told him did not include any reference to Enmund. Ida Jean Shaw testified to Enmund's absence that morning and his statements of his complicity. But the only evidence of the degree of his participation is the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes. The jury could have concluded that he was there, a few hundred feet away, waiting to help the robbers escape with the Kerseys' money. The evidence, therefore, was sufficient to find that the appellant was a principal of the second degree, constructively present aiding and abetting the commission of the crime of robbery. This conclusion supports the verdicts of murder in the first degree on the basis of the felony murder portion of section 782.04(1)(a).
*1371 The judgment of conviction of two counts of first-degree murder and one count of robbery is therefore affirmed.

III. Sentence
We come now to the consideration of the sentences of death imposed on the appellant pursuant to section 921.141, Florida Statutes (Supp. 1974). The appellant has presented a number of arguments in his brief, only a few of which we find merit consideration.
Appellant contends that section 921.141 improperly restricts the jury and judge to the consideration of the mitigating circumstances enumerated in the statute. Thus, he argues, the statute violates the eighth and fourteenth amendments under Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). We have held that our statute, as it has been construed and applied, does not restrict the jury's consideration and differs from the statute considered in Lockett. Songer v. State, 365 So.2d 696, 700 (1978) (on rehearing), cert. denied, 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979). See generally Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); State v. Dixon, 283 So.2d 1 (Fla. 1973).
Appellant contends that the trial judge's factual findings on which he based the decision to impose death were derived in part from information not disclosed to the appellant and which he therefore had no opportunity to rebut, explain, or deny. A death sentence based on such nondisclosed information would violate the rule of Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). During the pendency of this appeal, we directed the judge who imposed the sentences in this case to state whether he did so based on any such nondisclosed information. We are satisfied from his response that there was no due process violation under Gardner.
The appellant advises us that Jeanette Armstrong, originally a co-defendant with him, was tried separately, convicted of two counts of second-degree murder and one count of robbery, and sentenced to three consecutive life sentences. He argues that his death sentences must be vacated because the jury was not advised of the ultimate disposition of the charges against Jeanette Armstrong.
In Messer v. State, 330 So.2d 137 (Fla. 1976), we vacated the sentence of death, partly on the ground that the court erred in refusing to permit the defendant to submit to the jury evidence of the plea-bargained conviction and sentence of the appellant's accomplice. Any evidence reasonably related to a valid mitigating consideration should, when proffered by the defendant, be admitted into evidence at the sentencing phase of a capital felony trial. See, e.g., Miller v. State, 332 So.2d 65 (Fla. 1976). Appellant did not proffer the evidence in question. Therefore, even assuming the information had some valid mitigating value, we can find no trial court error under the Messer rule.
Appellant contends that since the evidence does not establish that he intended to take life, the death penalty is impermissible under the eighth amendment ban on cruel and unusual punishment. Appellant offers us no binding legal authority that directly supports this proposition, and we therefore reject it.
After the sentencing hearing was held and sentencing arguments presented to the jury, the jury recommended a sentence of death. The trial judge sentenced appellant to death and subsequently put his findings and considerations in writing as follows:
In accordance with the mandate of the Florida Supreme Court the Court makes the following findings of fact:
1. As an aggravated circumstance, the capital felony, that is, the murders of Thomas Henry Kersey, aged 86 years and his wife Eunice Maye Kersey, aged 74, were committed while the defendant Enmund was engaged, or was an accomplice, in the commission of or an attempt to commit an armed robbery. FS 921.141(5)(d).

*1372 2. As a further aggravating circumstance, the Court finds that the capital felony was committed for pecuniary gain. FS 921.141(5)(f). The evidence is abundantly clear that the armed robbery was committed for pecuniary gain and that the defendant Enmund was previously aware that Mr. Kersey had a reputation for keeping large sums of money on his person. The defendant Enmund actually saw Mr. Kersey with money, and the testimony amply indicates that the armed robbery of April 1, 1975, was planned ahead of time by the defendant Enmund.
3. As a further aggravating circumstance, the Court finds that the capital felony was especially heinous, atrocious, or cruel. FS 921.141(5)(h). The evidence amply supports a finding that the killing of Mr. Kersey aged 86, and Mrs. Kersey aged 74, was not a spontaneous matter. A reasonable person must conclude that the killings were done for no other purpose than to eliminate Mr. and Mrs. Kersey as witnesses to the armed robbery. The killings were premeditated in that Mr. Kersey was shot two (2) times and Mrs. Kersey was shot six (6) times. Two (2) bullets were subsequently recovered from the house, one (1) in the water heater and one (1) in the doorjamb. The medical examiner testified that in his opinion the bodies had to have been shot while in a prone position (his alternative explanation was that someone could have stood on a roof and shot down, or else tied the Kerseys' by their feet, hoisted them up and shot them from below). The entry of the bullets indicates that Mr. and Mrs. Kersey were in a prone position, that is, helpless to resist. The evidence indicates that Mrs. Kersey was shot first in the left side and that these wounds were not fatal, and that thereafter someone stood back and fired upon her prone body and then fired the bullets into the heater and the wall. Further, two (2) different weapons, that is, a .22 caliber weapon and a .38 weapon were fired at and into Mr. and Mrs. Kersey.
Three individuals were charged with these crimes. The defendant Enmund and the defendant Sampson Armstrong were tried together and the defendant Jeanette Armstrong was tried separately. The Court knows from this trial and from the trial of Jeanette Armstrong that she was shot at the scene and sustained serious wounds. Since the defendant Jeanette Armstrong was seriously wounded and since both Mr. and Mrs. Kersey were each shot with bullets from two (2) different caliber guns, and since the evidence establishes that Mr. and Mrs. Kersey were each shot while in the prone position, it is only reasonable to conclude, and the Court so finds, that the defendant Enmund and the defendant Sampson Armstrong, each fired into the bodies of Mr. and Mrs. Kersey.
4. As a further aggravating circumstance, the Court finds that the defendant Enmund was previously convicted of a felony involving the use or threat of violence to the person. FS 921.141(5)(b). At the advisory hearing the State introduced a certified copy of a Judgment and Committment [sic] from the United States District Court, Southern District of Georgia, establishing that on April 10, 1957, the defendant Enmund was convicted of two (2) separate offenses of robbery by the use of violence.
5. The other aggravating circumstances to-wit: FS 921.141(5)(a); 921.141(5)(c); 921.141(5)(e); and, 921.141(5)(g), are inapplicable in this case.
As to mitigating circumstances involving the defendant Earl Enmund, the Court finds that none of the statutory mitigating circumstances applied to this defendant:
1. In particular, the Court has considered FS 921.141(6)(a), and finds that the defendant has previously been convicted of the felony of robbery.
2. As to FS 921.141(6)(b), there is absolutely no evidence or suggestion that the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.
3. As to FS 921.141(6)(c), there is absolutely no evidence that the victims *1373 were a participant in the defendant's conduct or consented to the act.
4. As to FS 921.141(6)(d), the evidence clearly indicates that the defendant was an accomplice to the capital felony and that his participation in the capital felony was major. The defendant Enmund planned the capital felony and actively participated in an attempt to avoid detection by disposing of the murder weapons.
5. As to FS 921.141(6)(e), there is absolutely no evidence that defendant acted under extreme duress or under the substantial domination of another person.
6. As to FS 921.141(6)(f), there is absolutely no evidence that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
7. As to FS 921.141(6)(g), the defendant was 42 years of age at the time of this offense.
Therefore, in consideration of the evidence presented at trial and at the sentencing hearing as to the defendant Earl Enmund, the Court finds that the aggravating circumstances of these capital felonies outweigh the mitigating circumstances, and upon consideration thereof, the Court was of the opinion at the time of sentencing and is now, some months later, that the sentence of death is justified and appropriate as to each Count of Murder in the First Degree.
The judge's findings that the capital felonies were committed in the course of robbery and that the capital felonies were committed for pecuniary gain both "refer to the same aspect of the defendant's crime." Provence v. State, 337 So.2d 783, 786 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). The robbery circumstance and the pecuniary motive constitute "only one factor which we must consider in this case." Id. at 786. Where such double consideration of one factor appears to have impaired the process of weighing the aggravating circumstances against the mitigating circumstances, the sentence of death must be vacated. See Elledge v. State, 346 So.2d 998 (Fla. 1977). The "mere recitation of both circumstances does not in all cases call for a condemnation of the sentencing hearing and judgment." Hargrave v. State, 366 So.2d 1, 5 (Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979). Here, even absent the consideration of either of the factors of robbery and pecuniary gain, there remains one valid statutory aggravating circumstance to consider. There are no mitigating circumstances. The fact that the murders took place in the course of a robbery and that the criminal episode was motivated by pecuniary gain will therefore simply be treated as one factor.
The recited circumstance, that the murders were especially heinous, atrocious, and cruel, cannot be approved. Armstrong v. State, 399 So.2d 953 (Fla. 1981). However, there are two aggravating circumstances (robbery-pecuniary gain and previous conviction of a violent felony) and no mitigating circumstances. The jury recommended death. The finding that no mitigating circumstances were present was not error. Therefore, the sentence of death is appropriate and we approve it.
The judgment and sentences are affirmed.
It is so ordered.
SUNDBERG, C.J., and ADKINS, BOYD and ENGLAND, JJ., concur.
OVERTON, J., concurs in part and dissents in part with an opinion.
OVERTON, Justice, concurring in part, dissenting in part.
I concur in affirming the conviction. I dissent in the sentence and would remand for resentencing in view of the specific finding of the majority that the appellant did not actually participate in the shooting. In his sentencing order the trial judge found to the contrary, expressing the view in his findings of aggravating circumstances that the appellant was present and assisted in the commission of the murder. In my opinion, these contrary findings require a resentencing proceeding.