CHRISTEN, Circuit Judge,
with whom Judges PREGERSON, WARDLAW, BERZON, and MURGUIA join, dissenting in Parts I and II, concurring in Part III:
The majority makes a persuasive case in support of an uncontested issue: that the record supported the jury’s decision to convict Gregory Dickens of robbery, conspiracy to commit robbery, and felony murder. But the question we must decide is whether the record and the law justify the Arizona Supreme Court’s decision to affirm the imposition of the death penalty. Because imposing the death penalty in this case is an unreasonable application of *1339 clearly established law as articulated by the United States Supreme Court in Enmund, v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), and because at least two unreasonable findings of fact were critical to the Arizona court’s decision, I respectfully dissent from the majority’s opinion.
Imposing the death penalty on Gregory Dickens, the getaway driver in an armed robbery “who neither took life, attempted to take life, nor intended to take life,” violates the Eighth and Fourteenth Amendments and is an unreasonable application of clearly established federal law. See Enmund, 458 U.S. at 787, 801, 102 S.Ct. 3368. Dickens’s participation in his crime so closely resembles the actions of Earl Enmund in Enmund v. Florida, where the Supreme Court held that the death penalty could not be constitutionally imposed, that it cannot be meaningfully distinguished. Dickens’s culpability falls far short of the narrow exception to Enmund, created by Tison v. Arizona, for individuals whose conduct constitutes “major participation” in the felony offense and reckless indifference to human life. 481 U.S. at 158, 107 S.Ct. 1676. The petition should be granted.
I. Unreasonable Application of En-mund/Tison
A. Major Participation
In Enmund v. Florida, the Supreme Court held that the death penalty was unconstitutional as applied to a petitioner convicted of felony murder under facts strikingly similar to Dickens’s case. 458 U.S. at 788-801, 102 S.Ct. 3368. Earl Enmund was a getaway driver in an armed robbery. Id. at 788, 102 S.Ct. 3368. While he was waiting in a car nearby, his accomplices killed two robbery victims at the back door of their home. Id. at 784, 788,102 S.Ct. 3368.
In its review of the Florida court’s death eligibility determination, the Court made clear that it had “no doubt that robbery is a serious crime deserving serious punishment,’ but it observed that robbery “is not, however, a crime ‘so grievous an affront to humanity that the only adequate response may be the penalty of death.’ ” Id. at 797, 102 S.Ct. 3368 (citing Gregg v. Georgia, 428 U.S. 153, 184, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). The Court further prefaced its opinion with the observation that the question before it was not whether the death penalty is a disproportionate punishment for murder generally, “but rather the validity of capital punishment for Enmund’s own conduct.” Id. at 798, 102 S.Ct. 3368. The Court stressed that the focus of inquiry must be on Enmund’s culpability rather than the culpability of the accomplices who committed the actual murder, “for we insist on ‘individualized consideration as a constitutional requirement in imposing the death sentence.’ ” Id. (quoting Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). The Supreme Court has been consistent in instructing that death sentences for accomplices who do not kill or intend that a killing take place are reserved for offenders who manifest the highest levels of culpability. See, e.g., Tison, 481 U.S. at 157, 107 S.Ct. 1676 (identifying offenders who rank among “the most culpable and dangerous of murderers”); Kennedy v. Louisiana, 554 U.S. 407, 420, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (stating that capital punishment must be limited to offenders with “extreme culpability” (internal quotation omitted)).
Enmund was by no means an innocent bystander; his involvement was that of an accomplice to a planned, armed robbery. Enmund, 458 U.S. at 797, 102 S.Ct. 3368. *1340 The Supreme Court cabined its opinion to an evaluation of the appropriateness of the death penalty in a situation where a defendant was not one of the triggermen, but was a constructive aider and abettor waiting to help his robber accomplices escape. Id. at 786 n. 2, 788, 102 S.Ct. 3368. Apart from his status as a getaway driver, the Court did not need to reach many of the facts in Enmund because the Florida Supreme Court did not rely on them. But it is clear that Enmund was a part of the planned criminal enterprise — he was, after all, the getaway driver waiting to help his accomplices escape at the time the murders took place. Indeed, in order to be convicted of aiding and abetting under Florida law at the time, Enmund had to be found to be constructively present, “pursuant to a previous understanding,” and situated so as to abet or encourage the actual perpetrator in committing the felony or in escaping after its commission. Enmund v. State, 399 So.2d 1362, 1370 (Fla.1981), rev’d, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).
Ultimately, the Court reasoned that because Enmund “did not kill or intend to kill,” the imposition of the death penalty was impermissible. 458 U.S. at 798, 801, 102 S.Ct. 3368. In reaching this decision, the Court observed that at the time of its opinion it was “not aware of a single person convicted of felony murder over the past quarter century who did not kill or attempt to kill, and did not intend the death of the victim, who has been executed.” Id. at 796, 102 S.Ct. 3368.
Dickens’s participation in the robbery that resulted in the murders of Laura and Bryan Bernstein is strikingly similar. If there is such a thing as a generic description for a getaway driver, Dickens’s involvement fits the bill: he helped plan the robberies in advance, he either “furnished Amaral with the weapon used in the murders or knew Amaral had the weapon with him for the robberies; [he] drove Amaral to the scene, waited while Amaral committed the robberies, picked up Amaral after the crime, witnessed the destruction of evidence, and failed to report the crimes.” State v. Dickens, 187 Ariz. 1, 926 P.2d 468, 490 (1996). The death penalty cannot be constitutionally applied in Dickens’s case because, as in Enmund, Dickens was a getaway driver for a planned robbery, he “did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder." Enmund, 458 U.S. at 795, 102 S.Ct. 3368. Dickens was removed from the immediate scene of the murder, just as Enmund was. See id. at 786, 102 S.Ct. 3368.
A writ of habeas corpus is appropriate if the adjudication of a claim “resulted in a decision that ... involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). “[A] state-court decision ... involves an unreasonable application of [Supreme Court] precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.” Williams v. Taylor, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (emphasis added). The Arizona Supreme Court’s decision to affirm the death penalty in Dickens’s case contravenes clearly established law set out in Enmund.
The imposition of the death penalty in this case cannot be justified under the narrow exception to the Enmund rule established in Tison v. Arizona, 481 U.S. at 158, 107 S.Ct. 1676. On the contrary, Ti-son ’s sharply contrasting facts only underscore that the death penalty should not be *1341 imposed here. The exception established in Tison permits the imposition of the death penalty for petitioners who neither intended to kill their victims nor inflicted the fatal wounds, but it is only available where there has been a finding that a petitioner’s “degree of participation in the crimes was major rather than minor, and the record would support a finding of the culpable mental state of reckless indifference to human life.” Id. at 151, 107 S.Ct. 1676.
It cannot be credibly argued that Dickens’s culpability approaches that of the Tison brothers, who helped their father — a convicted murderer — and their father’s cellmate — another convicted murderer— escape from prison. Murder was not just a hypothetical result of the Tison brothers’ plan; they knew their father had murdered a prison guard during a previous prison escape. Id. Armed with an ice chest full of guns, the Tison brothers were major participants in a crime spree that progressed from a jailbreak to robbery, kidnaping, and the murder of four members of an innocent family. Id. at 139-42, 107 S.Ct. 1676. The Supreme Court concluded that the Tison brothers’ participation would “clearly support a finding that they both subjectively appreciated that their acts were likely to result in the taking of innocent life.” Id. at 152, 107 S.Ct. 1676 (emphasis added).
The Tison brothers’ active participation continued after they helped the two murderers escape from prison. When the getaway car they were using had a flat tire and they needed a different vehicle, id. at 140, 152, 107 S.Ct. 1676, one of the Tison brothers “performed the crucial role of flagging down a passing car occupied by an innocent family whose fate was then entrusted to the known killers he had previously armed.” Id. at 151, 107 S.Ct. 1676. The brothers robbed the family, participated in driving the family into the desert, and guarded the victims at gunpoint. Id. at 140, 151, 107 S.Ct. 1676. They knew that their father was “thinking about” killing the family, but there is no hint that the brothers made any attempt to intervene. See id. Instead, the record showed that the brothers were standing close by when they “saw [their father’s cell mate] and their father brutally murder their four captives with repeated blasts from their shotguns.” Id. at 140-41, 107 S.Ct. 1676. One brother “later said that during the escape he would have been willing personally to kill in a ‘very close life or death situation’ and that he recognized that after the escape there was a possibility of killings.” Id. at 144, 107 S.Ct. 1676.
Regarding the Tison brothers’ degree of participation, the Court wrote: “Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight.” Id. at 158,107 S.Ct. 1676.
Dickens, by contrast, was “sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery.” Id. The robbery took place at night, in a rest area on the opposite side of a divided highway from where Dickens waited in a getaway car. Dickens, 926 P.2d at 474-75. Though the majority paints a picture in which Dickens watched “each part” of the murders, the record only shows that, from where he waited on the far side of the highway, Dickens could see a flicker of light as Amaral and the victims passed in front of the headlights on the Bernsteins’ car.
*1342 B. Reckless Indifference
Under the exception articulated in Ti-son, even major participation in a felony offense is insufficient unless it is combined with a finding of “reckless indifference to human life.”[1] 481 U.S. at 158, 107 S.Ct. 1676. This requirement presents an independent constitutional barrier to imposing the death penalty in Dickens’s case because support for the Arizona court’s finding of reckless indifference to human life is considerably weaker here than it was in Tison.
Tison recognized that the common law and modern criminal codes classify behavior that constitutes “reckless indifference to human life” with intentional murder. Id. at 157, 107 S.Ct. 1676. Today, the Model Penal Code continues to observe this important classification. Model Penal Code § 210.2(1). Tison does nothing to undermine the long-standing reservation of the death penalty for only the most serious offenders. Under Tison, it is the reckless disregard for human life implicit in “knowingly engaging in criminal activities known to carry a grave risk of death ” that represents the highly culpable mental state that may be considered in death eligibility determinations. 481 U.S. at 157-58, 107 S.Ct. 1676 (emphasis added).
In its analysis of the reckless indifference part of the Tison exception, the Arizona Supreme Court adopted the trial court’s findings regarding Dickens’s major participation, discussed above.[2] Dickens, 926 P.2d at 490. The Arizona court also considered three other factors: “that Defendant [1] had considerable experience with the justice system through his other felony convictions, [2] was aware that Amaral had a violent and explosive temper, and [3] failed to render aid knowing that one victim might not be dead.” Id. None of these factors warrants the imposition of the death penalty in this case.
First, the Arizona court referred to Dickens’s “considerable experience with the justice system through his other felony convictions” when it decided that Dickens acted with reckless indifference to human life. Id. But Dickens’s prior convictions were for forgery and lewd and lascivious acts with a minor; deplorable crimes, but not crimes that demonstrate a reckless indifference to human life.
The Arizona Supreme Court also considered that Dickens knew Amaral had a violent and explosive temper. The majority also cites this factor, arguing that Dickens “could have foreseen that lethal force might be used,” and suggesting that this is a marked difference between Dickens’s case and Enmund. Maj. Op. at 1314, 1315. But by relying on the foreseeability of this robbery going awry, the Arizona court and the majority stray from the boundaries imposed by the Supreme Court. If the “reckless indifference” part of the Tison test could be satisfied merely by showing that it was foreseeable an armed robbery could turn deadly, the Ti-son exception would swallow the Enmund *1343 rule. As the Supreme Court expressly acknowledged in Tison:
[participants in violent felonies like armed robberies can frequently ‘anticipate that lethal force ... might be used ... in accomplishing the underlying felony.’ Enmund himself may well have so anticipated. Indeed, the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen....” 481 U.S. at 151, 107 S.Ct. 1676 (internal citation omitted).
In Tison, the Supreme Court rejected Arizona’s less rigorous standard that permitted application of the death penalty for murder accomplices who could “anticipate[ ] that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony.” Id. at 150-51, 107 S.Ct. 1676. Because virtually any armed robbery carries the risk that lethal consequences could result, the majority errs by treating forseeability as a proxy for the more demanding “reckless indifference” -standard required by the Court. Id.
Finally, the Arizona court concluded that the reckless indifference part of the Tison exception was satisfied because Dickens “failed to render aid knowing that one victim might not be dead.” 926 P.2d at 490. The record simply does not support this finding of fact. At best, Amaral initially gave equivocal testimony at trial regarding whether Dickens drove through the rest area after Amaral committed the murders, but he corrected his own testimony and clarified that he could not recall whether this occurred.[3] Even after prompting, Amaral testified, “I still don’t remember him coming in as I’m going out. There was not enough time span where he left the other side to get across when I was running.” Transcript of Record at 199, State v. Dickens, (Ariz.Super.Ct.1993) (No. 18454). The only other witness, Dickens himself, flatly denied that he drove into the rest area. Id. at 162. Because the Arizona Supreme Court, and the majority, place significant emphasis on speculation that Dickens knew one of the victims might have survived, it is important to recognize that the jury did not hear conflicting testimony on this point. The finding that Dickens failed to render aid to a surviving victim was not the result of the jury hearing two versions of events and simply choosing to believe one witness instead of the other. To be sure, Amaral was a shockingly inconsistent witness— even debuting an entirely new account of the events for the first time at trial that involved Dickens actually giving him directions via never-previously-mentioned walkie-talkies.[4] But there is no support for the Arizona court’s unreasonable finding that Dickens drove through the rest area and failed to render aid to a surviving victim.
The majority recognizes, as it must, that Amaral’s “walkie-talkie scenario” cannot reasonably be relied upon. Maj. Op. at 1307 n. 4. Amaral had made no mention of *1344 the “walkie-talkie scenario” in any of his pre-trial statements and no physical evidence supported this theory. Conveniently, Amaral’s new version of the robbery involved the claim that Dickens and Amaral were using walkie-talkies and that Dickens directed Amaral to leave “no witnesses.” But in his argument before the Arizona Supreme Court, even the Arizona Assistant Attorney General conceded that neither the jury nor the trial court believed Amaral’s walkie-talkie story.[5] He argued that the Arizona Supreme Court “shouldn’t believe[ ] the walkie-talkie testimony” either. The Assistant Attorney General surmised, “maybe [Amaral] decide^] to add a little something extra to his testimony to try and make it more damning to [Dickens].” Transcript of Oral Argument, State v. Dickens, 187 Ariz. 1, 926 P.2d 468 (1996) (No. 93-0548). The Assistant Attorney General added, “there is no question here, the plan was to rob. The plan was not to kill.” Id.
Disregarding the evidence in the record and the position of the Arizona Assistant Attorney General, the “Facts and Procedural History” section of the Arizona court’s opinion includes that court’s independent factual finding that “speaking through the walkie-talkie, Defendant then told Amaral, ‘No witnesses.’ ” Dickens, 926 P.2d at 474. And the section of the Arizona court’s opinion that specifically considered the imposition of the death penalty builds on this mistake, citing Dickens’s “fail[ure] to render aid knowing that one victim might not be dead.” Id. at 490. The only way Dickens would have known that Bryan Bernstein had survived is if he had driven through the rest area, and there is no competent evidence that this occurred.
A petition for writ of habeas corpus may be granted where it is shown that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2). Here, evidence from the trial court proceedings does not support the Arizona Supreme Court’s independent finding that Dickens gave directions to Amaral over a walkie-talkie, or its finding that Dickens failed to render aid.
In light of the evidence presented in the state court proceeding, how is it that the majority reaches the conclusion that Dickens, a getaway driver, fits into the narrow exception carved out by Tison ? What facts permit Dickens’s actions to be deemed comparable to the extraordinarily more culpable criminal conduct of the Ti-son brothers? The majority answers these questions by relying on at least two critical, unsupported, and unreasonable findings of fact. In other words, the majority makes the same mistakes made by the Arizona court.
First, the majority states: “Dickens drove through the rest stop to, in his words, verify that ‘everything was taken care of and pick up Amaral.” Maj. Op. at 1313 (emphasis added). But these were not Dickens’s words; they were Amaral’s words, and, as already explained, Amaral corrected his own testimony on cross examination by clarifying that, “The only thing I can remember is he came and picked me up, I don’t know if he was leaving the interstate as far as leaving the *1345 rest stop or coming into the lane going out of the rest stop.” Transcript of Record at 88, State v. Dickens, (Ariz.Super.Ct.1993) (No. 18454). Without evidence that Dickens drove through the rest area, the only hint of support for the finding that Dickens “failed to render aid knowing that one of the victims might not be dead” is the thoroughly discredited walkie-talkie testimony that neither the trial court nor the jury believed.
Second, likely because the Tison court considered the Tison brothers’ proximity to the murders in that case, the majority attempts to place Dickens in close proximity to the murders. The majority asserts that Dickens “watched from his truck” and could see “each part of the Bernsteins’ murders as they unfolded.” Maj. Op. at 1307, 1313. But the record contradicts the notion that Dickens could see the murders. The Arizona Supreme Court’s opinion certainly does not support the majority’s assertion; it only notes that it was 9:17 p.m., that Dickens was waiting in the eastbound rest area, that he saw the Bernsteins’ car drive into the westbound rest area across the highway, and that Dickens later “saw a muzzle flash and heard two shots.” 926 P.2d at 474-75. The trial court record actually refutes the majority’s finding. Officer Johnson (the first officer on the scene), speaking from his previous experience being at the subject rest areas at night, testified that the rest areas have no lighting, and that, looking from one rest area to the other, at best only silhouettes can be seen. Dickens testified consistently. He said he watched Amaral “disappear[ ] out of my sight just about the side of the freeway” and that he could only see “shadows” or “flashes of light as if someone passed in front of the headlights.” The evidence does not support the majority’s statement that Dickens watched “each part of the Bernsteins’ murders as they unfolded.” Maj. Op. at 1313.
What the record does support is that Dickens did what getaway drivers do. Like Enmund, he planned or acquiesced in plans to commit an armed robbery, drove a dangerous accomplice to the crime scene, waited for the robbery to occur, drove his accomplice away from the crime scene, witnessed or directed the destruction of evidence, and failed to report the crimes.[6]
The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to this case and the majority correctly notes that the threshold to obtain relief is heightened due to its application. But in my view relief should be granted in this case because the Arizona Supreme Court’s decision involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, and because it was based on an unreasonable determination of the facts in light of the record before the state court. Harrington v. Richter,— U.S.-, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011) (quoting 28 U.S.C. § 2254). The majority argues that relief cannot be granted because the facts of Dickens’s case fall somewhere between the facts in Enmund and the facts in Tison. That will always be true when a decision runs afoul of the rule that a state court unreasonably applies clearly established federal law when it fails *1346 to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. Williams, 529 U.S. at 407, 120 S.Ct. 1495. Read together, Enmund and Tison reaffirm that the death penalty is to be reserved for the very most culpable offenders. Where the facts do not show that a defendant killed, attempted to kill, or intended to kill, the Constitution requires a showing of major participation in criminal activities known to carry a grave risk of death and reckless disregard for human life. Allowing the death penalty to be imposed on a getaway driver in a planned armed robbery — even a getaway driver who later witnessed the destruction of evidence — is an unreasonable application of clearly established federal law.
The Arizona Supreme Court’s decision also rests upon objectively unreasonable findings of fact. The trial court’s special verdict makes no mention of walkie-talkies or the “no witnesses” comment. The finding in the Arizona Supreme Court’s death eligibility determination — that Dickens “failed to render aid knowing that one victim might not be dead” — was made by the Arizona trial court, but it was utterly unsupported. As explained, there was no competent evidence that Dickens drove through the rest area, and, therefore, no basis for the court’s speculation that Dickens knew Bryan Bernstein may have survived the shooting.
The Supreme Court has observed that, “[w]hen the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint.” Kennedy, 554 U.S. at 420, 128 S.Ct. 2641. The majority’s read of Enmund is so narrow that it would likely forbid habeas relief to Earl Enmund himself. The majority finds Dickens’s actions comparable to those of the Tison brothers, yet the Tison brothers’ active participation in murder and reckless indifference to human life made them the epitomes of the exception to the rule that those who do not murder, attempt to murder, or intend that a murder occur, should be spared the death penalty.
A getaway driver in an armed robbery, Dickens is entitled to habeas relief because the Arizona Supreme Court’s adjudication of the death penalty claim was an unreasonable application of clearly established law as articulated by the United States Supreme Court, 28 U.S.C. § 2254(d)(1), and because it rested on at least two unreasonable determinations of fact in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(2).
II. The Martinez Issue
Petitioner argues that post-conviction counsel was ineffective for failing to argue the ineffectiveness of his sentencing counsel. Before Martinez v. Ryan,—U.S.-, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), that claim was barred. After conducting a lengthy, pr e-Martinez evidentia-ry hearing, the district court found that the additional factual allegations contained in the four volumes of exhibits filed with Dickens’s federal habeas petition:
“materially strengthen the claim presented to the state courts” and “pres-ente ] this claim in a significantly different and stronger posture than it had in state court and fundamentally alters the claim considered by the state courts.”
The district court used unequivocal language: footnote 9 of its December 2004 ruling states that the court “summarily rejects Petitioner’s argument that the additional factual allegations in support of habeas Claim 19 were fairly presented and exhausted in the state court and rejects that the Arizona Supreme Court’s independent review exhausted these allegations.”
Because Martinez permits petitioners to argue the ineffectiveness of post-conviction *1347 counsel, and because the district court found that the previously unconsidered evidence fundamentally alters the ineffective assistance of counsel claim in this case, I agree with the majority that this case must be remanded to the district court for initial consideration of the claim that counsel provided ineffective assistance.
III. Conclusion
I respectfully dissent from the majority’s analysis of Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). For the reasons explained, I would grant relief and decline to reach petitioner’s argument under Martinez v. Ryan,—U.S.-, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012). Nevertheless, because the majority does reach the Martinez issue, I join in its judgment to vacate the district court’s ruling regarding whether cause existed to overcome the procedural default of Dickens’s claim of ineffective assistance of sentencing counsel, and to remand to the district court to consider the issue in light of Martinez.

. Notably, though the Tison brothers provided an "arsenal of lethal weapons” to two convicted murders, were "prepared to kill in furtherance of the prison break,” and had heard their father say he was "thinking about” killing an innocent family they had helped rob and kidnap, the United States Supreme Court did not make a finding of reckless indifference to human life. Tison, 481 U.S. at 151, 107 S.Ct. 1676. Instead, the Court remanded the question to the Arizona court to make that determination.

. The Tison court noted that a finding of reckless indifference might be supported by the same facts that support a finding of major participation. 481 U.S. at 158 n. 12, 107 S.Ct. 1676.

. During trial Amaral testified: "I do believe from a conversation we had later on, he did say he was going through the rest stop to make sure nobody was moving or everything was taken care of.” Transcript of Record at 16, State v. Dickens, (Ariz.Super.Ct.1993) (No. 18454). But on cross examination Amaral clarified that he could not remember whether Dickens drove through the rest stop: "The only thing I can remember is he came and picked me up, I don't know if he was leaving the interstate as far as leaving the rest stop or coming into the lane going out of the rest stop.” Id. at 88.

. Amaral agreed to testify against Dickens to avoid receiving the death penalty himself, and he gave several pre-trial statements. Dickens, 926 P.2d at 478.

. There can be little doubt the jury did not buy the last minute flourish Amaral added to his testimony; they acquitted Dickens of premeditated murder and conspiracy to commit murder. The majority acknowledges as much: "[T]he jury did not convict Dickens of premeditated murder or conspiracy to commit murder, indicating it likely did not believe Amaral’s testimony that Dickens ordered him to kill the Bernsteins over a two-way radio.” Maj. Op. at 1315 n. 13.

. In a further attempt to distinguish Dickens’s case from Enmund, the majority argues that Dickens participated in the destruction of evidence and either provided a weapon to Amaral, or knew that Amaral had one. Maj. Op. at 1311. The Supreme Court did not reach these facts, but the record does show that Enmund and Dickens have these actions in common. There was testimony in Enmund's case that he directed his common-law wife to get rid of the guns used in the murders, see 399 So.2d at 1366, and Enmund likely supplied at least one of the weapons used in the crime. Id.