334 So.2d 823 (1976)
Alvin Bernard DAVIS, Appellant,
v.
STATE of Florida, Appellee.
No. AA-275.
District Court of Appeal of Florida, First District.
July 13, 1976.
Richard W. Ervin, III, Public Defender, and David J. Busch, Asst. Public Defender, for appellant.
Robert L. Shevin, Atty. Gen., and Carolyn M. Snurkowski, Asst. Atty. Gen., for appellee.
RAWLS, Acting Chief Judge.
Appellant-defendant Davis was informed against, tried and, upon a jury verdict, convicted of possession of a firebomb with intent to burn a building, from which he now appeals.
Determinative of this controversy is appellant Davis's assertion that he was denied a fair trial within the meaning of the Sixth Amendment, United States Constitution, and Article I, Section 16, Florida Constitution, by reason of prosecutorial misconduct. Appellant's justiciable grievance is that the prosecuting attorneys improperly coerced a witness to testify against him. We agree and reverse.
At the outset of the trial and in the absence of the jury, Mr. Davis, an assistant state attorney, had the following colloquy with the trial court:
"MR. DAVIS: Your Honor, we request that the swearing in of the jury be delayed for a period of 30 minutes. We have a witness upstairs who has testified at a prior deposition. She saw all of the provocation, which would be factual matters to be brought forth before the jury in this case and she is now advising us that she did not see anything and furthermore, that she will not testify.
"This witness is the girl friend of the defendant [appellant] and we are requesting this additional period of time to work with her in an attempt to get her to either 
"THE COURT: Let him finish, please.
"MR. DAVIS: Requesting the additional period of time to work with her and determine whether or not she will in fact *824 get on the stand and will in fact commit perjury.
"THE COURT: What say you for the defense?
"MR. CANIPELLI: [Appellant's defense counsel] Your Honor, I would ask that I be allowed, one of the Public Defenders be allowed to be present during this session so no threats are made against this witness.
"THE COURT: Any counsel for the record can speak to any witness and if counsel steps out of line, I'm sure he is sufficiently acquainted with the ethics and I am not going to presume that he is not. Do you understand what I mean?
"MR. DAVIS: Yes."
After a short recess, the court reconvened (out of the presence of the jury) and at this time the trial judge inquired of Mr. Davis if he was acquainted "with the Lee case in Fernandina"[1] and stated: "You understand it was an unethical matter to threaten someone to change their testimony back or so forth? Do you remember reading that case?", and Mr. Davis replied, "No." The trial court then advised Davis that the usual procedure in the case of a witness changing his testimony is for the court to declare him a hostile witness giving each party the right to cross examine and impeach, and that the question of perjury is a matter outside of the case. Another short recess was had, and upon the court reconvening, Davis advised the trial judge that he had read the Lee case during this last recess but did not think his prior actions fell within the purview of it. Davis then described in detail what had transpired with the witness, viz:
"MR. DAVIS: I was advised at approximately 9:30 this morning that the state's witness ... had disappeared. She had come down to the Courthouse. We couldn't find her.
"I contacted our investigator and gave him a picture of the woman. He located her. She was wandering around the Courthouse here. He located her, kept her in his custody until I had an opportunity to talk with her.
"I took her up to the office. At that time, I attempted to question her as to why she was being uncooperative. For the first five or ten minutes, she refused to answer any of my questions. I told her if she would not tell me what the problem was, I couldn't understand what the problem was.
"She then said she did not wish to testify.
"I asked her why she didn't wish to testify and she wouldn't tell me. I gather from talking with her sister that apparently she is pregnant by the defendant [appellant] and does not wish to testify against him for the reason that he is the father of her child to be.
"Based on that, I told her that  I asked her, I asked her what would she testify to if she were called to the stand and told to testify.
"She said that she would testify that she wasn't there and she didn't see anything and he wasn't there.
"I advised her that she had given a deposition earlier which under oath she testified to facts directly contrary to that. She had testified that she was in fact there; that she had in fact seen the defendant there, and that he had in fact in his possession an incendiary device, apparently a firebomb; that he had lit it and thrown it at the house and she had seen all of his actions done by him.
I further advised her that if she took the stand under oath and testified that she had not seen anything and she was not there, that that would constitute perjury in my opinion, that the penalty for perjury *825 was 15 years, and that as an Assistant State Attorney, if she committed perjury under oath, I would have a duty to prosecute for that perjury.
"This is basically what has transpired in a brief sense.
......
"... I am not attempting to prevent this witness from testifying. She certainly  she's not what I could call a State's witness. She was a party. She was there. Now she's trying to tell me, if she is called to the stand she is going to testify she didn't see anything. I'm trying to get her to take the stand, to tell the truth. I am not trying to get her to give a different story. I think this is where the difference is."
Assistant State Attorney Silberhorn then revealed to the court that he had informed the witness that she had three choices: 1) to take the stand and say that she saw nothing, subjecting herself to a charge of perjury and 15 years, 2) to refuse to testify and be in contempt of court, or 3) to take the stand and tell the truth in which case nothing would happen. The assistant state attorney denied trying to influence or bias the witness.
Ultimately, the witness took the stand and testified that she had seen appellant throw a firebomb at a house. On redirect examination the following transpired:
"Q. [the State] I understand ma'am, now. And you didn't want to testify against him; is that correct?
"A. Yeah.
"Q. All right. Now, did you have a conversation with me today? My name is Ed Silberhorn. Do you remember me upstairs?
"A. Yes.
"Q. Did we discuss this matter about you wanting to testify and not wanting to testify?
"A. We didn't discuss it. You said something about it.
"Q... . Did I not tell you this morning, ma'am, that you had a duty to tell the truth in this case and that if you didn't tell the truth, that the State could prosecute you for perjury?
"A. Yes.
"Q... . And did I not tell you if you took the stand and refused to say anything against your lover, that the Judge could take that into consideration after you've been sworn under oath for purposes of direct contempt?
"A. Yes.
"Q. And did I not also tell you that if you stood up there and told the truth, the truth exactly as you told it, that nothing wrong would happen to you at all?
"A. You did, but the other one said he would personally see to it that I got 15 years and took to jail today.
......
"Q. And have you told the truth?
"A. Yeah, as long as I can remember I have.
On recross examination the following colloquy was had:
"Q. [defense attorney] Can you describe this other man, ma'am? Can you describe the man who told you that other statement, that he would personally see that you would get 15 years?
"A. They called him Marshall. That is all I know.
......

*826 [The state stipulated that "the other man" was Assistant State Attorney Davis.]
"Q. Ma'am, were you scared of testifying today?
"A. Yes, I'm scared.
......
"Q. Is it because any of these prosecutors threatened to give you 15 years?
"A. That is one reason. I told him, `How would you like to be locked up?'
......
"Q. But you did at one point tell him you didn't remember anything about that night; is that correct?
"A. I told him I was going to get up here  he said he would have the jury took out and have the Judge put me in jail if I said that."
The trial court admonished the assistant state attorneys for their conduct but declined to grant a motion for mistrial.
As this court stated in Lee v. State, supra, quoting Mathews v. State, 44 So.2d 664, 669 (Fla. 1950), one who interviews witnesses before trial "must exercise the utmost care and caution to extract and not to inject information, and by all means to resist the temptation to influence or bias the testimony of the witnesses."
It is our opinion that the "interview" of the subject witness shortly before her testimony by the assistant state attorneys, at which time she was threatened with prosecution for perjury, constituted the type of undue pressure condemned in Lee.
While it is true that the assistant state attorneys admonished the witness to tell the truth, it must have been obvious to the witness that the "truth" was that which she had testified to at an earlier deposition. Rules of evidence and procedure exist which are designed to assist prosecution and defense alike in eliciting the truth from balky witnesses. Coercion and threats are not among these rules.
REVERSED for a new trial.
MILLS and SMITH, JJ., concur.
NOTES
[1] Lee v. State, 324 So.2d 694 (1 Fla.App. 1976).