399 So.2d 953 (1981)
Sampson ARMSTRONG, Appellant,
v.
STATE of Florida, Appellee.
No. 48516.
Supreme Court of Florida.
March 26, 1981.
As Corrected on Denial of Rehearing June 15, 1981.
*955 Robert E. Pyle, Lake Alfred, for appellant.
Jim Smith, Atty. Gen., and George R. Georgieff and Donald K. Rudser, and Lawrence A. Kaden, Asst. Attys. Gen., Tallahassee, for appellee.
PER CURIAM.
This cause is before the Court on appeal from a judgment of conviction on two counts of murder in the first degree and one count of robbery. The Circuit Court of the Tenth Judicial Circuit, in and for Hardee County, sentenced appellant Sampson Armstrong to death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The appellant and co-defendant Earl Enmund were tried together and convicted of the first-degree murders and robbery of Thomas and Eunice Kersey. After returning verdicts of guilt the trial jury heard evidence on the issue of sentence pursuant to section 921.141, Florida Statutes (1975), and recommended the death penalty for both defendants. The trial court imposed sentences of death on Armstrong for the two counts of first-degree murder and a sentence of life imprisonment for the crime of robbery. We affirm his convictions and sentences of death.

I. Facts
On April 1, 1975, at about eight o'clock, a.m., the bodies of Thomas and Eunice Kersey were discovered by their daughter in their rural Hardee County home, located on state highway 62 between Fort Green to the west and Wauchula to the east. Mr. and Mrs. Kersey, aged eighty-six and seventy-four respectively, had been shot to death.
Some of the evidence constituting the state's case in the trial court consisted of physical items recovered at the scene and examined in the course of investigation. The bodies were found on the kitchen floor, near the back door of the home. There was a quantity of blood on the floor, some five feet away from where the bodies were lying, that prompted the authorities to investigate the possibility that one of the perpetrators was wounded during the attack. Later that morning, police found Jeanette Armstrong, the wife of appellant Sampson Armstrong, being treated for a gunshot wound in a hospital in nearby Avon Park, in Highlands County. The blood recovered at the scene proved to be of a different type from either of the Kerseys' blood, and to match the blood type of Jeanette Armstrong.
On the ground outside the house, investigators found a plastic jug filled with water.
There were four firearm projectiles found at the scene. One was on the ground outside the house, one in the door jamb of the back door, one in the water heater in the kitchen of the house, and one on the floor, under the body of Mrs. Kersey. Mrs. Kersey was shot six times in all, with three of the wounds being superficial so that three of the bullets exited the body. Three bullets remained in her body and were recovered. The three bullets found in the body all entered the body in the right side and passed downward.
Mr. Kersey was shot twice. One bullet entered his right arm and passed on through his heart to the left side of his body. The other entered his chest from directly in front. Both bullets were recovered. The bullet that entered from the right side had a slight downward angle. The one that entered the front of the chest was almost straight in its path from front to back. According to expert firearms identification testimony, one of the bullets recovered was a .38 caliber and the other was a .22 caliber. The .38 caliber bullet from the body of Mr. Kersey, a.38 caliber *956 bullet from the body of Mrs. Kersey, and the .38 caliber bullet found in the kitchen door jamb, were all fired from the same weapon. The .22 caliber bullet found in the body of Mr. Kersey and a .22 caliber bullet from Mrs. Kersey were both fired from the same gun.
The pathologist who testified at trial told the court and the jury that when a bullet enters the body, it can be deflected in numerous ways, so that it is difficult to tell of the angle of fire from the path of the bullet. With regard to the specific question of reconstructing the position of Mrs. Kersey when she was shot, based on the paths of the bullets, the pathologist testified, "Well, there are all sorts of possibilities... . There is really no way that I could determine what position her body was in when she was shot... . [S]he was shot from below, above, and behind." None of the entrance wounds on either of the bodies was inflicted from a range of closer than several feet away.
The state presented the testimony of a witness who drove by the Kersey home between 7:30 and 7:40 a.m. on the day the bodies were found. When she passed the Kersey home, she saw on the side of the road a large, cream-colored car with a license tag bearing the prefix number 18. There was a black man in the car. Another witness for the state drove by the house at 7:35 that morning and saw a car parked beside the road about two hundred yards west of the house. It was a large, yellow car with a dark colored top. There was one person in the car.
The state's evidence also included the testimony of two of the Kerseys' neighbors. One testified that on April 1st he was at work on his own land only two or three hundred yards from the Kerseys' house when, at about 7:45 a.m., he heard from six to fifteen shots of gun fire and some high-pitched screaming. The other neighbor said that he lived only two hundred yards west of the Kerseys, and that between 7:30 and 8:00 o'clock that morning he heard about seven loud sounds. He would have thought that they were caused by Mr. Kersey hammering to separate some scrap metal, except for their irregular sequence. From the sounds he remembered, he concluded that they also could have been gunfire.
A neighbor of the appellant also testified for the state. He said he lived about three-fourths of a mile from Enmund's home, and that they both lived on a road that runs off of New York Avenue south of the town of Wauchula. This witness testified that on the morning of April 1st, at about 6:30 he was standing out beside the road, New York Avenue, that goes into Wauchula to the north. He was waiting for a ride that was to take him to another town on personal business. The person who was to meet him there did not come that morning, but he was still standing there waiting for him after 8:00 o'clock. The witness said that at approximately 6:30 or 6:45, he saw co-defendant Earl Enmund and his former common-law wife Ida Jean Shaw in their yellow Buick with a vinyl top. Ida Jean Shaw was driving. There were two others in the back seat, one male and one female. The car traveled north toward town (the town of Wauchula). At about 8:00 o'clock, the car came back, travelling "pretty fast" in a southerly direction on New York Avenue, with the appellant driving, Ida Jean Shaw in the front seat, and one of the other two people in the car lying down across the back seat.
The husband of the Kerseys' granddaughter testified that Mr. Kersey usually kept large amounts of money on his person. He generally kept the cash in the form of one-hundred-dollar bills. It was not unusual for him to have from ten to twenty of these on his person at any given time. He kept the money in his wallet, and the wallet was in his hip pocket at all times. He normally slept in his regular work clothing and kept the wallet in his pocket even as he slept.
Mr. Kersey, the witness testified, liked to show his money to people he dealt with, and he did so frequently and indiscriminately. He tended to save his money rather than to spend it, and he was proudly vocal about having it. He was a large, strong man who felt that he could protect his wallet.
*957 Another witness testified that two weeks prior to the murders, he saw that Mr. Kersey had from twelve to fifteen hundred dollars on his person.
A few weeks prior to the murders, Earl Enmund and a friend jointly purchased a calf from Mr. Kersey. They paid him in cash and when Mr. Kersey took out his wallet to put away the money he showed them its contents. Enmund said, "Look at the money this man's got." Mr. Kersey responded, "That ain't no money. I can dig up $15,000, $16,000 any time I want to." Enmund's friend told Mr. Kersey that he shouldn't be showing his money around like that. Mr. Kersey said, "I know you, Jim." The other man responded, "Yeah, you know me but you don't know the rest of them." After the killings, Mr. Kersey's wallet was not found on his person or anywhere in the house.
J.B. Neal testified that at about noon on April 1, 1975, he saw Sampson Armstrong in Lake Placid, in Highlands County. Armstrong told Neal that he and his wife Jeanette had done a robbery that morning at a ranch house outside of Wauchula and that Jeanette had been shot. Armstrong told the witness that they had gone to the back door of the house of an elderly man and woman, saying that they needed water for an overheated car. When Mr. Kersey came out of the house, Armstrong grabbed him, held his gun on him, and told Jeanette to get the money out of his pocket. Then, the old man cried out to his wife, and through the window Armstrong saw Mrs. Kersey coming out the front door and around the house with a gun. Mrs. Kersey shot Jeanette Armstrong. Then Armstrong knocked the old man down and shot Mrs. Kersey. Mr. Kersey got back up and Armstrong shot him in the chest. After the shooting, they put the old people in the house, took the money and left.
Jeanette Armstrong is the daughter of Ida Jean Shaw. In April of 1975, Ida Jean Shaw and Earl Enmund were living together as husband and wife, and had been doing so for about twelve years.
There was testimony that the investigating authorities, based on witnesses' descriptions of the car seen near the Kersey home the morning of the murders, began to search for a large, yellow or cream-colored car with a dark top and having a number 18 license tag prefix. They found a car meeting this general description in the possession of Ida Jean Shaw.
At Walker Memorial Hospital in Avon Park on the morning of the murders, police questioned Ida Jean Shaw concerning Jeanette Armstrong's gunshot wound. She told them that she and Jeanette had been travelling that morning from Wauchula to Avon Park when Jeanette entered an orange grove to urinate and was shot. In the subsequent course of the investigation of the Kersey murders, Ida Jean Shaw gave a statement to the state attorney implicating Earl Enmund and Sampson Armstrong in the crimes. Subsequent to that initial statement, she gave two statements, one of them a formal deposition, in which she repudiated the original statement. In these statements she said that Jeanette Armstrong left her house on March 31, 1975 with two men referred to as Luke and Willie. According to this story, Jeanette said that they were going to Fort Myers to a nightclub. On the following morning, Luke and Willie brought Jeanette home wounded. Jeanette, Luke and Willie then told Ms. Shaw to tell anyone who asked that Jeanette had been shot while trespassing in a citrus grove. The import of the story told in the depositions was to implicate "Luke and Willie" in the Kersey murders and to exculpate the defendants. In one of her depositions, Ida Jean Shaw stated that her earlier statement implicating the defendants in the crimes was false and was fabricated by agreement with Jeanette Armstrong and calculated to put Enmund and Armstrong in jail and thus be free of the strictures of married life.
Ida Jean Shaw, over the objections of the defendants, was called to testify at trial as a court's witness. The court examined her and then the state and counsel for each of the defendants cross-examined her.
*958 Ms. Shaw testified at trial as follows. At and around the time of the crimes, she and Enmund lived together in a house on Revell Road in Wauchula, and that they had held themselves out to friends and neighbors and in business transactions as husband and wife for twelve years. Her daughter Jeanette was married to Sampson Armstrong and lived in Lake Placid. On the weekend preceding Tuesday, April 1st, Ms. Shaw celebrated a birthday. On Friday night, Jeanette came to her home. On Sunday, she and Jeanette went to Lake Placid and brought Sampson Armstrong back. On Monday night, March 31, Jeanette Armstrong, Enmund, and the appellant were all there at the house in Wauchula. On Tuesday, April 1st, when she awoke at about 7:45 a.m., none of the three was there. Neither was her brown and yellow 1969 Buick.
Ms. Shaw got up and went to the neighborhood wash house. About ten minutes later, either Enmund or Sampson Armstrong came into the wash house and told her that Jeanette had been shot. Ida Jean Shaw went back to the house. Jeanette was in Earl Enmund's red Plymouth automobile. The appellant was with her and Enmund was in the house. Ms. Shaw then took Jeanette up to the local store corner and called an ambulance. Then Enmund came to the corner where they were awaiting the ambulance and asked her what had happened to Jeanette. Ida Jean Shaw told Enmund that Jeanette had been shot in an orange grove. Then the ambulance came and Ida Jean accompanied Jeanette on the ride to the hospital. Ida Jean learned from Jeanette how she was shot. Earl followed in a separate car. Sampson Armstrong also went to the hospital that day.
After spending Tuesday morning at the hospital, Ms. Shaw left there with Earl and Sampson. They went to Wauchula to get the children and then went on to Lake Placid. On the way to Wauchula, Ida Jean Shaw asked Enmund "why he did it." He replied that he had seen Mr. Kersey's money and therefore decided to rob him. Sampson Armstrong said that he made sure the people were dead.
Ida Jean Shaw testified further that on Wednesday, April 2, 1975, she, Earl, Sampson, and some of her children were in a car on their way home from the hospital when Sampson gave her $200. By passing written notes in the car, she asked him how much money he got out of the robbery and he responded that he had $600 left. She took the $200 and made a loan payment on an account of Earl Enmund's that was in arrears. There was corroborating testimony of this, and that the bill was paid with two one-hundred-dollar bills.
Ms. Shaw testified that prior to the events of April 1st, she kept a .22 caliber pistol in the glove compartment of her car. On April 2, she removed the gun from the loft at her house on Earl Enmund's directions. He and Sampson told her to get rid of the gun and also a .38 caliber pistol that was at the house, because, Sampson said, they had been used to kill some people. She put the guns in the bottom of a bucket of greens and gave the bucket to a friend, Jeanette's paternal uncle. This person testified that the bucket was a large and heavy metal one and that the greens spoiled in the trunk of his car. He said he threw them away, bucket and all, and didn't know about the guns. The murder weapons were never recovered.
At trial Ms. Shaw testified that the story about Luke and Willie was a complete fabrication, and that she made up the story and related it at the request of the defendants. Earl Enmund, she said, instructed her on this matter in letters smuggled out of the jail.
The state's counsel moved that Ida Jean Shaw be called as a court's witness on the ground that due to the inconsistencies in her pretrial statements, the state was not certain how she would testify and would not vouch for her credibility. Through her examination by the court, cross-examination by the state, and cross-examination by counsel for each of the defendants, the following matters pertaining to her credibility were brought out for consideration by the jury. Ms. Shaw was granted immunity *959 from prosecution for any role she might have played in the murders and robbery. As related above, she gave several inconsistent statements during the investigation and prosecution of the crimes. One of her statements was in a deposition under oath, and at trial she conceded that she had lied in that statement. Prior to the trial, she was charged with perjury. She was arrested and held in jail for thirteen days. The prosecutors advised her of the maximum penalty for the crime of which she stood accused. Then they promised her that she would not be prosecuted for perjury if she would testify at the murder and robbery trial and tell the truth.

II. Issues on Appeal of the Judgment of Conviction
The appellant raises several points which he contends require the reversal of his convictions.
The appellant argues that the trial court erred in admitting the testimony of Ida Jean Shaw. He asserts that her inconsistent pretrial statements, which resulted in a charge of perjury, rendered her so unreliable as to be an incompetent witness. He also contends that the pendency of her perjury prosecution, which she was promised would be discontinued if she would testify truthfully, created an unacceptably high risk that her testimony would be the product of coercion.
With regard to the unreliability argument, the trial court informed the jury that Ms. Shaw was being called as a court's witness because the state could not vouch for her credibility. The jury was instructed to consider her testimony and to accord it whatever credibility they thought it deserved. It is within the discretion of the trial judge to call an uncooperative witness as a court's witness to allow the state to ask leading questions. McCloud v. State, 335 So.2d 257 (Fla. 1976).
With regard to the issue of coercion, the appellant cites Davis v. State, 334 So.2d 823 (Fla. 1st DCA 1976), cert. denied, 345 So.2d 427 (Fla. 1977), and Lee v. State, 324 So.2d 694, 695 (Fla. 1st DCA 1976). The Lee case quoted this Court's statement in Mathews v. State, 44 So.2d 664, 669 (Fla. 1950), that
in interviews with witnesses before trial, the examiner "must exercise the utmost care and caution to extract and not to inject information, and by all means to resist the temptation to influence or bias the testimony of the witnesses."
Lee v. State, 324 So.2d at 698.
In Davis, the prosecuting attorney asked the trial court to delay the swearing of the jury because one of the witnesses he intended to call had become uncooperative. The witness, a close friend of the defendant, had made a statement in a deposition which linked the defendant to the crime but immediately before trial gave a different account of what she knew. The prosecutor conferred with her and told her that she had three choices: refuse to testify and be held in contempt of court and jailed; give an account that differed from her deposition statement and be charged with perjury and possibly imprisoned for fifteen years; or testify to "the truth" in which event nothing would happen to her. The circumstances of the prosecutor's conference with the witness were revealed to the jury. On appeal, the district court reversed and remanded for a new trial, citing as authority Lee v. State. Applying the Lee principle to the facts before it, the court in Davis concluded:
While it is true that the assistant state attorneys admonished the witness to tell the truth, it must have been obvious to the witness that the "truth" was that which she had testified to at an earlier deposition. Rules of evidence and procedure exist which are designed to assist prosecution and defense alike in eliciting the truth from balky witnesses. Coercion and threats are not among these rules.
Davis v. State, 334 So.2d at 826.
The appellant contends that when the prosecution told Ida Jean Shaw that she could be released from jail and have the perjury charges dropped if she would tell "the truth", there is an unacceptably high probability that she understood that the "truth" the prosecution wanted was testimony *960 linking the appellant to the crimes. We disagree. In Lee v. State, the error was not in allowing the witness to testify but in keeping from the jury information regarding the arrangement by which the state gained the cooperation of the witness. In Davis, the prosecutor indicated to the witness that she should testify consistently with what she said before. Thus he "injected" information. In the case sub judice, the prosecution did not suggest to Ms. Shaw what they wanted her to say, but simply advised her to tell the truth. We hold that the court did not abuse its discretion in allowing into evidence the testimony of Ida Jean Shaw.
The appellant contends that a new trial is required because the jury was not fully informed of the understanding between the state and Ida Jean Shaw. It is true, as appellant points out, that it is a denial of due process if the jury is misled as to facts bearing on the credibility of a witness. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). If a failure to fully inform the jury of the interest of a witness could in any reasonable likelihood have affected the decision of the jury, a new trial is required. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Wolfe v. State, 190 So.2d 394 (Fla. 1st DCA 1966). Our review of the record reveals that the jury in the present case was fully informed of Ms. Shaw's immunity transaction and her pending perjury prosecution.
Having given careful consideration to appellant's arguments, and having reviewed the record to determine the sufficiency of the evidence, we affirm the judgment of conviction.

III. Sentence
We come now to the consideration of the sentences of death imposed on the appellant pursuant to section 921.141, Florida Statutes (1975).
Appellant contends that the trial judge's factual findings on which he based the decision to impose death were derived in part from information not disclosed to the appellant and which he therefore had no opportunity to rebut, explain, or deny. A death sentence based on such nondisclosed information would violate the rule of Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). During the pendency of this appeal, we directed the judge who imposed the sentences in this case to state whether he did so based on any such nondisclosed information. We are satisfied from his response that there was no due process violation under Gardner.
The appellant advises us that Jeanette Armstrong, originally a co-defendant with him, was tried separately, convicted of two counts of second-degree murder and one count of robbery, and sentenced to three consecutive life sentences. He argues that his death sentences must be vacated because the jury was not advised of the ultimate disposition of the charges against Jeanette Armstrong.
In Messer v. State, 330 So.2d 137 (Fla. 1976), we vacated the sentence of death, partly on the ground that the court erred in refusing to permit the defendant to submit to the jury evidence of the plea-bargained conviction and sentence of the appellant's accomplice. Any evidence reasonably related to a valid mitigating consideration should, when proffered by the defendant, be admitted into evidence at the sentencing phase of a capital felony trial. See, e.g., Miller v. State, 332 So.2d 65 (Fla. 1976). Appellant did not proffer the evidence in question Therefore, even assuming the information had some valid mitigating value, we can find no trial court error under the Messer rule.
After the sentencing hearing was held and sentencing arguments presented to the jury, the jury recommended a sentence of death. The trial judge sentenced appellant to death and subsequently put his findings and considerations in writing as follows:
In accordance with the mandate of the Florida Supreme Court the Court makes the following findings of fact:
1. As an aggravated circumstance, the capital felony, that is, the murders of Thomas Henry Kersey, aged 86 years and *961 his wife Eunice Maye Kersey, aged 74, were committed while the defendant Armstrong was engaged, or was an accomplice, in the commission of or an attempt to commit an armed robbery. FS 921.141(5)(d).
2. As a further aggravating circumstance, the Court findings that the capital felony was committed for pecuniary gain. FS 921.141(5)(f). The evidence is abundantly clear that the armed robbery was committed for pecuniary gain and that the co-defendant Earl Enmund was previously aware that Mr. Kersey had a reputation for keeping large sums of money on his person. The co-defendant Enmund actually saw Mr. Kersey with money, and the testimony amply indicates that the armed robbery of April 1, 1975, was planned ahead of time by the co-defendant Enmund and that the defendant Armstrong participated in the planning and preparation.
3. As a further aggravating circumstance, the Court finds that the capital felony was especially heinous, atrocious, or cruel. FS 921.141(5)(h). The evidence amply supports a finding that the killing of Mr. Kersey aged 86, and Mrs. Kersey aged 74, was not a spontaneous matter. A reasonable person must conclude that the killings were done for no other purpose than to eliminate Mr. and Mrs. Kersey as witnesses to the armed robbery. The killings were premeditated in that Mr. Kersey was shot two (2) times and Mrs. Kersey was shot six (6) times. Two (2) bullets were subsequently recovered from the house, one (1) in the water heater and one (1) in the doorjamb. The medical examiner testified that in his opinion the bodies had to have been shot while in a prone position (his alternative explanation was that someone could have stood on a roof and shot down, or else tied the Kerseys' by their feet, hoisted them up and shot them from below). The entry of the bullets indicates that Mr. and Mrs. Kersey were in a prone position, that is, helpless to resist. The evidence indicates that Mrs. Kersey was shot first in the left side and that these wounds were not fatal, and that thereafter someone stood back and fired upon her prone body and then fired the bullets into the heater and the wall. Further, two (2) different weapons, that is, a .22 caliber weapon and a .38 weapon were fired at and into Mr. and Mrs. Kersey.
Three individuals were charged with these crimes. The co-defendant Enmund and the defendant Sampson Armstrong were tried together and the defendant Jeanette Armstrong was tried separately. The Court knows from this trial and from the trial of Jeanette Armstrong that she was shot at the scene and sustained serious wounds. Since the defendant Jeanette Armstrong was seriously wounded and since both Mr. and Mrs. Kersey were each shot with bullets from two (2) different caliber guns, and since the evidence establishes that Mr. and Mrs. Kersey were each shot while in the prone position, it is only reasonable to conclude, and the Court so finds, that the co-defendant Enmund and the defendant Sampson Armstrong, each fired into the bodies of Mr. and Mrs. Kersey.
4. The other aggravating circumstances to-wit: FS 921.141(5)(a); 921.141(5)(b); 921.141(5)(c); 921.141(5)(e); and 921.141(5)(g), are inapplicable in this case.
As to mitigating circumstances involving the defendant Sampson Armstrong, the Court makes the following findings:
1. The Court has considered FS 921.141(6)(a), and finds that the defendant has previously been convicted of, and was on parole for, a felony at the time of the instant offenses, to-wit: Breaking and Entering.
2. As to FS 921.141(6)(b), the defendant Armstrong attempted to establish that he was under the dominance of the co-defendant Enmund and the co-defendant Jeanette Armstrong, his wife, however, this attempt failed and there is no believable evidence that the capital felony was committed while the defendant Armstrong was under the influence of extreme mental or emotional disturbance.

*962 3. As to FS 921.141(6)(c), there is absolutely no evidence that the victims were a participant in the defendant's conduct or consented to the act.
4. As to FS 921.141(6)(d), the evidence clearly indicates that the defendant was an active accomplice to the capital felony and that his participation in the capital felony was major. As stated in paragraph 3 of the aggravating circumstances, the evidence leads to the reasonable conclusion that the defendant Armstrong fired into the prone bodies of Mr. and Mrs. Kersey.
5. As to FS 921.141(6)(e), there is no believable evidence that defendant acted under extreme duress or under the substantial domination of another person. (See paragraph 2 above)
6. As to FS 921.141(6)(f), there is absolutely no evidence that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
7. As to FS 921.141(6)(g), the defendant was 23 years of age at the time of this offense and this constitutes the only possible mitigating circumstance as to the defendant Armstrong.
Therefore, in consideration of the evidence presented at trial and at the sentencing hearing as to the defendant Sampson Armstrong, the Court finds that the aggravating circumstances, and upon consideration thereof, the Court was of the opinion at the time of sentencing and is now, some months later, that the sentence of death is justified and appropriate as to each Count of Murder in the First Degree.
The trial court found three aggravating circumstances: that the murders were committed in the course of a robbery; that they were committed for pecuniary gain; and that they were especially heinous, atrocious and cruel. The court also stated that appellant's age of 23 years at the time of the crime "constitutes the only possible mitigating circumstance." On review of the sentencing findings, evidence, and record we conclude that this statement does not constitute a finding of a mitigating factor based on youth. The court found that there were no mitigating circumstances and the factor of age was given no consideration.
The court's findings that the capital felonies were committed in the course of robbery and that the capital felonies were motivated by pecuniary gain both "refer to the same aspect of the defendant's crime." Provence v. State, 337 So.2d 783, 786 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). The robbery circumstance and the pecuniary motive constitute "only one factor which we must consider in this case." Id. at 786. Where such double consideration of one factor appears to have impaired the process of weighing the aggravating circumstances against the mitigating circumstances, the sentence of death must be vacated. See Elledge v. State, 346 So.2d 998 (Fla. 1977). The "mere recitation of both circumstances," however, "does not in all cases call for a condemnation of the sentencing hearing and judgment." Hargrave v. State, 366 So.2d 1, 5 (Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979). The fact that the murders took place in the course of a robbery and that the criminal episode was motivated by pecuniary gain constitute one valid aggravating circumstance, amply established by the evidence.
The finding that the murders were especially heinous, atrocious, and cruel cannot be sustained. The language of this statutory aggravating circumstance was expounded upon in State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). The majority opinion in that case said:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by *963 such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
Id. at 9. Based on that interpretation, the Court stated in Cooper v. State, 336 So.2d 1133 (Fla. 1976), cert. denied, 431 U.S. 925, 97 S.Ct. 2220, 53 L.Ed.2d 239 (1977), that a murder by shooting that causes instantaneous death is simply not in the "heinous, atrocious, or cruel" category.
In support of his finding that the killings were especially heinous, atrocious, or cruel, the trial judge made reference to the ages of the victims and stated that the killings were "not a spontaneous matter." The testimony at trial revealed, however, that the murders were only at the scene of the crime for a very brief period. The shots were heard at 7:45; the victims were found dead at 8:00 o' clock. The only direct account of what transpired is from the testimony of J.B. Neal about Armstrong's statement to him. By that account, the shootings were indeed spontaneous and were precipitated by the armed resistance of Mrs. Kersey. The judge also found support for the finding of this factor in the fact that the murders were premeditated. Nothing in section 921.141, as it stood at the time of the crimes and the trial of this case, nor in the decisions of this Court construing it, supports the proposition that the factor, heinous, atrocious, or cruel is established by the existence of premeditation.
Discussing further the basis for his finding, the judge said, "A reasonable person must conclude that the killings were done for no other purpose than to eliminate Mr. and Mrs. Kersey as witnesses to the armed robbery." A purpose to eliminate witnesses has been said to support the finding that a capital felony "was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." § 921.141(5)(e), Fla. Stat. (1975); Riley v. State, 366 So.2d 19 (Fla. 1978). In order for such witness-elimination motive to support a finding of the avoidance of arrest circumstance when the victim is not a law enforcement officer, "[p]roof of the requisite intent to avoid arrest and detection must be very strong... ." Riley v. State, 366 So.2d at 22.
It has been said that execution-type slayings, evincing a cold, calculated design to kill, fall into the category of heinous, atrocious, or cruel. Magill v. State, 386 So.2d 1188 (Fla. 1980); Alvord v. State, 322 So.2d 533 (Fla. 1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976). In order to invoke such a basis for a heinousness finding, however, the same standard of proof as is required to establish a purpose to eliminate witnesses should be applied. It simply cannot be said that there was proof that the robbers killed in order to assure that there would be no witnesses against them.
The trial judge based his conclusion on the testimony of the pathologist. The judge found the testimony to show that the victims, after the initial shooting, were laid out prone and then "finished off." The testimony of the pathologist makes clear, however, that his conclusions as to the direction of fire and the positions of the victims when shot were equivocal at best. Thus it was insufficient to prove that the motivation was witness elimination. It is possible to infer that the robbers used their guns in order to increase their chances of departing the Kersey ranch with their lives.
The jury recommended death. The trial judge erroneously considered certain circumstances as aggravating. The error did not impair the process of weighing the aggravating against the mitigating circumstances because there were no mitigating circumstances to weigh. The killings took place in the course of a robbery. Death is the appropriate punishment. The sentences of death are affirmed.
It is so ordered.
ADKINS, BOYD, OVERTON and ENGLAND, JJ., concur.
SUNDBERG, Chief Justice, concurs as to conviction, and dissents as to sentences:
Due to substantial errors in the aggravating findings, I dissent from affirming the *964 death sentences and would remand for resentencing by the trial judge only.