REVISED OPINION
SHIVERS, Judge.
This is a case involving a wife’s attempt to have charges filed against her husband dropped prior to the trial. The State Attorney’s Office elected to prosecute the matter and a jury found appellant guilty of aggravated assault and aggravated battery. Appellant now alleges that the prosecutor’s communications with his wife (the victim) prior to trial constituted a denial of due process and necessitates a new trial. We disagree.
At the time of the incident giving rise to this case, appellant and his wife, Mrs. Coleman, were separated but were attempting a reconciliation. The incident took place in Mrs. Coleman’s home, which she had pur *1207 chased after the separation. The principal fact in dispute is whether Mrs. Coleman actually observed the appellant with a gun, or whether she merely assumed that he had a gun.
Mrs. Coleman’s initial contact with the State Attorney’s Office took place immediately following the incident, on 8/13/84. According to Mrs. Coleman’s later testimony at the hearing on appellant’s motion for new trial, the State Attorney’s Office was unwilling to become involved in her case until she told them that she thought appellant had a gun. Appellant was arrested two days later.
On 10/9/84 Mrs. Coleman’s deposition was taken by defense counsel, Moss. In response to Mr. Moss’ question, “Whose gun was it?,” Mrs. Coleman gave the following testimony:
It was his gun. He came back in, but while he went out, I was in the back. And when he came in the house, all — I could hear him with the gun. And then he came back from the back and he pulled the gun and told me he was going to kill me. So he cocked it, and the whole time I was begging him pleading, please don’t. Please don’t. And he drew it back and he cocked it and he pulled the trigger once at my head. By that time I was screaming, and he told me to shut up and he just kept hitting me and hitting me.
Prosecutor DeCandio was not present at the deposition.
On 11/1/84, Mrs. Coleman visited the State Attorney’s Office a second time and provided DeCandio with a sworn statement. In regard to the weapon, the following colloquy took place:
Q: Did he at any time have a weapon in his possession?
A: Yes.
Q: What kind of weapon?
A: A gun.
Q: Was this a handgun?
A: Yes.
Q: Did he ever point the gun at you?
A: Yes.
Q: Did he ever threaten you with it?
A: Yes.
Q: Did he ever at any time cock it or pull the trigger?
A: Yes, both,
Q: Was it pointed at you?
A: Yes.
Q: Did he give you any reason to believe that the gun was not loaded when he did that?
A: I don’t know one way or the other. According to Mrs. Coleman, her purpose for visiting DeCandio’s office on 11/1/84 was to speak with him about dropping the charges against her husband. She states that when she arrived, a court reporter was present and DeCandio told her that before they discussed dropping the charges, he wanted to “touch base” with her as to what was said at the 10/9/84 deposition. After giving the sworn statement, according to Mrs. Coleman, DeCandio stated he had decided not to drop the charges. He then handed her a trial subpoena and told her that if she did not appear at trial she would be held in contempt.
After their 11/1/84 meeting, Mrs. Coleman spoke with DeCandio four or five more times about dropping the charges. Mrs. Coleman stated that during this time, DeCandio assured her that he felt appellant would be acquitted, but that if he were not, the most he would face on conviction would be counseling.[1] Mrs. Coleman in turn relayed that information to her husband and frequently discussed with him her understanding that he would at most receive counseling. Two weeks prior to the trial, Mrs. Coleman spoke with defense counsel Moss to inform him that she wished to drop *1208 the charges. She also made a last attempt with DeCandio on the morning of the trial.
A jury trial was held on 12/6/84 at which Mrs. Coleman testified. The appellant did not testify, nor was any defense presented by appellant. Mrs. Coleman’s entire trial testimony concerning the weapon consisted of the following two colloquys:
Q: At any time during this ordeal did Gregory Coleman point a weapon at you?
A: Yes.
Q: What kind of weapon was it?
A: It was a gun.
Q: Was it a rifle or a pistol?
A: Pistol.
Q: All right. Where did he point the pistol?
A: At my head.
Q: Did he say anything to you when he did it?
A: That he should pull the trigger, that he should kill me.
Q: Did he pull the trigger?
A: Yes.
Q: Did he pull the trigger more than once?
A: Yes.
******
Q: When Gregory held the gun to you— when did you first see the gun? Did he have the gun in the automobile?
A: No.
Q: When he held the gun to your head, you said that he pulled the trigger, what happened when he pulled the trigger? A: It just clicked.
Q: Beg your pardon?
A: It just clicked, the gun.
Q: How many times was that done? A: Two or three.
Defense counsel’s cross-examination of Mrs. Coleman did not address the details of the incident whatsoever. However, Mrs. Coleman did testify on cross-exam that she had visited both DeCandio and Moss in her attempts to have the charges dropped, that she still wished to drop them, and that DeCandio had told her she could be held for contempt or perjury if she changed her testimony or failed to appear. The appellant did not testify and no defense was presented. The trial concluded with the jury finding appellant guilty of both aggravated assault and aggravated battery.
On January 21, 1985, a hearing was conducted on appellant’s motion for new trial, at which both Mrs. Coleman and appellant testified. According to Mrs. Coleman, De-Candio told her that if she cooperated she could make it easy on herself, but that if she resisted it would be difficult. Mrs. Coleman testified, “I really didn’t see a choice. It was either testify or go to jail myself.” Mrs. Coleman reiterated that De-Candio had assured her that appellant would at most receive counseling. She stated that had she known that he was facing a three-year minimum mandatory sentence, she would not have testified at trial.
Likewise, appellant testified that his decision not to testify or present a defense at trial was based on the discussions he had had with his wife after her visits with DeCandio. He stated that had he known of the possibility of a three-year minimum mandatory sentence, he would not have refused to testify at trial and he would have presented a defense. However, when appellant was asked whether Mr. Moss ever advised him of the possible three-year minimum mandatory sentence, appellant replied, “If that was expressed to me, I truly didn’t understand.” While there is no direct evidence in the record as to whether Moss advised appellant of the three-year minimum mandatory sentence, Moss stated by way of affidavit that it was possible that appellant misunderstood the sentence due to the representations of his wife and to his confusion at the time.
The trial court denied appellant’s motion for new trial and this appeal was filed. Appellant now contends that Prosecutor DeCandio’s communications with his wife prior to trial constituted improper coercion and necessitates a new trial. In support of his argument, appellant cites Lee v. State, 324 So.2d 694 (Fla. 1st DCA 1976) and Davis v. State, 334 So.2d 823 (Fla. 1st DCA *1209 1976). We disagree that a new trial is necessary and feel that the above cited cases may be distinguished from the instant case.
In Lee, this court, quoting from Matthews v. State, 44 So.2d 664, 669 (Fla.1950), held that in interviewing witnesses before trial the examiner “must exercise the utmost care and caution to extract and not to inject information, and by all means to resist the temptation to influence or bias the testimony of the witnesses.” 324 So.2d at 698. The court in Lee found that the prosecutor’s remarks to the witness constituted attempts to inject information and to influence or bias the testimony which the witness was prepared to deliver, requiring a new trial.
The Davis case suffered from similar infirmities. There, a witness initially testified during a deposition that she saw the defendant light a firebomb and throw it at a house. Prior to trial, she informed the prosecutor that she did not wish to testify, and that if she was called she would testify that she had not seen anything. The prosecutor conferred with the witness and told her she had three choices: (1) take the stand and say she saw nothing, subjecting herself to a perjury charge; (2) refuse to testify and be held in contempt of court; or (3) take the stand and tell the truth, in which case nothing would happen. This court held that, in admonishing the witness to tell “the truth,” it must have been obviOus to her that “the truth” consisted of the version of the testimony given in her deposition. By so doing, the prosecutor had exerted the type of undue pressure condemned by the court in Lee.
In contrast, in the instant case we find no action by the prosecutor which could be construed as an attempt to inject information into Mrs. Coleman’s testimony or to influence or bias the content of that testimony. First, the testimony in this case does not contain the same type of inconsistencies found in the cases cited above. In fact, the only difference between Mrs. Coleman’s post-trial testimony, and that given at the trial and pre-trial was her statement that she merely assumed her husband had a gun, but that she never actually saw a gun. At no point did she recant her earlier testimony by indicating that the events she previously testified to had not actually occurred. Thus, her testimony at the hearing on the motion for new trial was more in the nature of a clarification — one which could have been made during the trial, had the defense counsel pursued such a line of questioning. Second, the prosecutor did not suggest to Mrs. Coleman what to say, but merely advised her of what the consequences would be if she failed to testify or if she failed to tell the truth. See Enmund v. State, 399 So.2d 1362 (Fla.1981). We recognize the difficulties facing an abused spouse who must testify against her husband, or, for that matter, the difficulties facing any “reluctant” witness. However, we are equally aware of the difficulties facing a prosecutor who is told by his key witness that he or she has decided not to testify. Since we do not believe that the prosecutor in this case threatened the witness or attempted to persuade her to stick with a particular version of her testimony, and especially in light of the fact that DeCandio’s conversations with Mrs. Coleman were made known to the jury, we cannot hold that the appellant was denied due process.
We find the remainder of appellant’s issues to be without merit. Accordingly, we hereby AFFIRM.
JOANOS and NIMMONS, JJ., concur.

. During the hearing on appellant’s motion for new trial, Prosecutor DeCandio stated that the only time he and Mrs. Coleman ever discussed punishment was in regard to a plea offer relayed by DeCandio to Attorney Moss. According to DeCandio, he informed Mrs. Coleman that he would be willing to accept a plea to aggravated battery in exchange for which he would drop the charge of aggravated assault with a firearm and would recommend a sentence of community control and counseling for a period of 12-18 months.