405 So.2d 170 (1981)
David Monroe GOODWIN, Appellant,
v.
STATE of Florida, Appellee.
No. 55086.
Supreme Court of Florida.
July 30, 1981.
Rehearing Denied November 16, 1981.
Michael B. Mann of Mann & Komarek, Lynn Haven, for appellant.
Jim Smith, Atty. Gen., and Miguel A. Olivella, Jr., Asst. Atty. Gen., Tallahassee, for appellee.
VANN, (Ret), Associate Justice.
This appeal by David Monroe Goodwin is from the conviction and imposition of the death penalty following the trial of the appellant on three counts of first-degree murder. After the jury found the appellant guilty, the same jury recommended a sentence of life imprisonment but the trial judge did not follow the recommendation and sentenced the appellant to death. This Court has jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution (1972). Walter Steinhorst and Charles Hughes were also indicted along with the appellant. Appellant's motion for severance of trial was granted. Walter Steinhorst was tried, convicted and sentenced to death in a separate trial. Charles Hughes was not apprehended until recently and has not been tried for his alleged involvement in the criminal episode.
The complex chain of events leading to the killings began with a meeting in Tallahassee, Florida, on either Thursday or Friday preceding the Sunday of January 23, 1977, when a plan was discussed to carry out a large marijuana smuggling operation on the Gulf Coast near Sandy Creek in Bay County, Florida. The testimony revealed that Bobby Joe Vines had been approached *171 by the Federal Bureau of Investigation for the purpose of setting up a marijuana smuggling operation in an effort to apprehend a reputed drug smuggler, Floyd Capo. Vines hired several persons to help plan and execute the operation and among these were the appellant, Bill Epperson, Steve Long, Chris Goodwin (brother of appellant), Walter Steinhorst and Charles Hughes. The appellant actually contacted his brother and Long, and brought them into the operation. Others involved were Steve Lukefahr, Tom Lukefahr, David Lukefahr, Tom Byerly, and Lloyd Woods.
After the meeting in Tallahassee, a group including Vines, appellant, Hughes, Steinhorst, and Epperson left for Panama City driving appellant's van and three ten-wheel trucks. Other members of the group were already in the Panama City area. David Capo, son of Floyd Capo, was in charge of determining each person's duties. Vines' duty was to go to the "Gunsmoke," a shrimp boat, to be standing offshore, and bring the marijuana to the shore to be unloaded. The unloading operation was to begin on Saturday night, January 22, 1977. On that night the group, equipped with the necessary gear, went to the shore to prepare for the unloading, but the initial effort was aborted in favor of the next night. The plans called for two of the large trucks to be placed about a mile and a half from the beach and the other one to be backed up to the shore. When the operation began, Walter Steinhorst was with the two parked trucks, armed with a rifle and pistol.
Four people, Harold Sims, Douglas G. Hood, Sheila McAdams and Sandra McAdams, riding in an old blue pickup truck, owned and driven by Sims, came upon Steinhorst who shot and killed Sims and imprisoned the other three in appellant's van. After the gunfire, appellant and Lloyd Woods left the beach site and drove to the place of the shooting. There appellant saw the body of Sims in the pickup. After speaking with Steinhorst, appellant appeared shaken. He returned to the loading area to pick up Vines who was returning with the first load of marijuana. Vines and the appellant then returned to see Steinhorst whom they found sitting in the driver's seat of appellant's van with the three captives in the rear. At appellant's request, Vines entered the van to guard the captives while appellant spoke with Steinhorst. Steinhorst had given Vines a gun to guard the captives and after his discussion with appellant he retrieved the gun and entered the van. Vines and the appellant then drove the victim's pickup truck, with Sims' body inside, into some bushes. Appellant instructed Vines to tell Hughes that Steinhorst wanted him and that appellant would meet him on the road leading to the parked trucks. Appellant also told Vines that they were going to tie the captives up and give them some money. Vines returned to the beach and informed Hughes of the killing and appellant's message.
Vines did not again see Steinhorst or Hughes that night, but he did see appellant on the beach. Afterwards, Vines left the loading area and proceeded to a farmhouse located between Quincy and Havana, Florida. Steinhorst and Hughes departed from the loading area in appellant's van with the body of Sims and the three captives. The captives' skeletal remains were found in a sinkhole in Taylor County on about August 7, 1977. Steinhorst and Hughes arrived at the farmhouse on Monday in appellant's van; appellant arrived on Tuesday. On that day, they burned the mattress and some clothes from appellant's van. Later the appellant gave Vines $2,000.00 to move Sims' truck.
At trial, Vines testified that everyone feared Steinhorst and Hughes, who had made clear that there would be no loose ends. Vines described appellant as being "real frantic," "in a panic" and "scared to death" after Steinhorst had shot Sims. Steve Lukefahr testified that appellant could not swallow and asked for water. Lukefahr also said they were all very scared and that no one could control Steinhorst. Tom Lukefahr also testified that appellant was sick to his stomach with fear and that he could not swallow. The fear that Steinhorst evoked was confirmed by William Epperson, who said that Steinhorst kept in *172 close touch with everyone after the incident telling them he had already killed four people and "he wanted to make sure he didn't have to kill any more." Appellant testified that he feared Steinhorst and Hughes and feared for the safety of his family.
The point raised by appellant as to the constitutionality of Florida's death penalty statute need not be met because of our reversal of the death sentence infra. The trial judge properly instructed the jury on the defense of duress; therefore, this issue raised by appellant is also without merit. The charge given by the court on circumstantial evidence was adequate and it was not error to deny appellant's requested charge based on Mayo v. State, 71 So.2d 899 (Fla. 1954). Had appellant objected to the remarks of the prosecutor in closing argument and had he moved for a mistrial, such statements complained of, in light of the record, would be harmless. See Clark v. State, 363 So.2d 331 (Fla. 1978). There was little dispute as to the events that occurred on the night of January 23, 1977, at Sandy Creek, and of the participation of the appellant in the proceedings that led to the death of the three captives. The sole defense of the appellant was coercion and this was rejected by the jury. In spite of appellant's contentions to the contrary, there was sufficient evidence for the trial judge to deny appellant's motion for judgment of acquittal and to support the jury's verdict of guilty on all three counts.
Appellant argues based on Adams v. State, 341 So.2d 765 (Fla. 1976), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 158 (1977), and State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974), that he cannot be convicted of first-degree felony murder because he was not present during the actual murders of the three captives. This argument is patently fallacious for as we pointed out in Enmund v. State, 399 So.2d 1362 (Fla. 1981), "if the accused was present aiding and abetting the commission or attempt of one of the violent felonies listed in the first-degree murder statute [kidnapping], he is equally guilty, with the actual perpetrator of the underlying felony, of first-degree murder." At p. 1370. Appellant's presence during the actual killings is simply irrelevant for the purposes of this issue; the critical fact is his participation in the underlying felony. There is ample evidence proving that appellant was a principal to kidnapping. As perpetrator of the underlying felony, he is a principal in the homicide. See Adams v. State, 341 So.2d at 768.
Although the crimes for which the appellant was convicted were cold-blooded and cruel, the appellant was not present at the time of the killings. Though the appellant may have thought the three victims he had helped tie up might be killed, and he may have later been glad that they were killed because one of the victims had recognized him, he was not the "trigger man" nor was he present during the killings. There was an abundance of testimony as to the fear that appellant had of Steinhorst and Hughes. Although the jury rejected this fear as coercion by its verdict of guilty, its recommendation of a sentence of life imprisonment could have indicated that the jury thought the fear had motivated appellant's participation in the tragic events. The facts of this case do not warrant the ultimate penalty. We do not intimate, however, that the presence of the defendant at the murder is always necessary for imposition of death.
Accordingly, the judgment of guilty on all three counts is affirmed. The sentence imposing the death penalty is hereby vacated and the cause is remanded to the trial court for imposition of life sentences without eligibility for parole for 25 years pursuant to Tedder v. State, 322 So.2d 908, 910 (Fla. 1975), in which this Court stated:
A jury recommendation under our trifurcated death penalty statute should be given great weight. In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ.
It is so ordered.
*173 SUNDBERG, C.J., and OVERTON, ENGLAND and ALDERMAN, JJ., concur.
BOYD, J., concurs in the affirmance of the convictions but, finding that the sentence of death is appropriate to this case, dissents from the reduction of sentence to life imprisonment.